COMMONWEALTH vs. GORDON K. ARMSTRONG, JR.

No. 07-P-1318.

Plymouth. April 17, 2008. - December 3, 2008.

Present: DUFFLY, ARMSTRONG, & BERRY, JJ.

*Rape. Assault with Intent to Rape. Jurisdiction, Of crime. Practice, Criminal,* Venue. *Evidence,* Medical record.

This court concluded that the defendant's convictions of forcible rape of a child must be reversed, and the indictments dismissed, where the predicate acts occurred during a cross-country trip at an unknown location outside Massachusetts, and therefore, Massachusetts courts lacked jurisdiction [248-253]; further, the venue statute, G. L. c. 265, § 24A, did not confer jurisdiction [253-254].

At the trial of indictments charging the defendant with forcible rape of a child, sufficient evidence existed to permit the jury to conclude that the defendant employed physical force, in that he digitally penetrated the victim while she was asleep, pulling her legs apart and positioning himself against her spread legs while he engaged in oral sex [254-255]; moreover, sufficient evidence existed to prove that the defendant employed constructive force, in that he took advantage of the young victim while she slept in his house, where he was an authority figure whom she trusted, and there was a great disparity in age and size between the defendant and the victim [255-256].

At the trial of indictments charging the defendant with forcible rape of a child, the admission in evidence of the victim's medical records without redaction to exclude certain hearsay statements, the prosecutor's references in his closing argument to those statements, and the judge's review of the records, even if error, did not give rise to a substantial risk of a miscarriage of justice, where the defendant agreed to the admission of the records and did not request any limitation on their use; where the entries in the medical records documenting the victim's medical history and treatment, medical opinions, and diagnosis were admissible under G. L. c. 233, § 79G; where the prosecutor's references to the statements were limited to highlighting the consistency in the victim's description of the rapes; and where the judge, as fact finder, was presumed to know the law and could read the records without being unduly influenced by any hearsay statements appearing in the unredacted records. [256-257]

INDICTMENTS found and returned in the Superior Court Department on May 13, 2005.

The cases were heard by *Barbara A. Dortch-Okara,* J.

*Cathleen E. Campbell* for the defendant.

*Mary E. Lee,* Assistant District Attorney, for the Commonwealth.

BERRY, J. This appeal follows a jury-waived trial in which the trial judge found the defendant guilty on seven indictments charging forcible rape of a child and one indictment charging assault with intent to rape a child. See G. L. c. 265, §§ 22A, 24B.

One of the issues presented by the defendant on appeal is unique to the first two rape indictments. These two charges arise out of acts of digital and oral rape of the victim that occurred during a cross-country trip at an unknown location in a State outside Massachusetts. The Commonwealth submits that, because the trip originated in Massachusetts, with a return to Massachusetts where the defendant continued to engage in acts of rape against the victim, and because no State can be determined as the locus of the crimes, then Massachusetts must be presumed to have jurisdiction over, and venue for trial of, these two rapes. We address this issue in part 1, *infra.*

The other appellate issues, involving the remaining five convictions of forcible rape and the one conviction of assault with intent to rape, regard the defendant's claims that: (a) there was insufficient evidence proving the element of force required under G. L. c. 265, § 22A[1]; and (b) the prosecutor's closing improperly referenced certain entries in the victim's medical records, which records had been admitted by agreement. We address these issues in parts 2 and 3, *infra.*

The trial evidence may be summarized as follows. The defendant and his family lived next door to the victim. The victim's stepmother is the defendant's niece. Beginning when the victim was eleven years old, and continuing until she was fourteen (from 2002 through March, 2005), she spent a great deal of time at the defendant's house in Carver, playing with two of the defendant's sons, who were close to her in age. The defendant, who was in his early fifties, regularly drove his sons and the victim to

---

[1]The defendant filed motions for required findings of not guilty, which were denied.

school, and the victim went over to the defendant's house three or four days per week after school. In addition, from time to time during weekdays, the victim slept over at the defendant's house, and also stayed there on many weekends.

When she was eleven years old, the victim traveled on a cross-country trip to Oregon in the defendant's family camper with the defendant, his wife, and three of his sons. One night as she slept, the defendant came to the victim's bed in the camper. The defendant removed her shorts and put his fingers inside her "private," moving his fingers in and out. Then, the defendant spread the victim's legs, put his face between her legs, and placed his tongue in her vagina. The victim pretended to remain sleeping. The victim recollected that the events happened during travel to Oregon, not on the way back to Massachusetts.

The defendant had done similar things to the victim before the Oregon trip, when she stayed at the defendant's house. Sometimes during these events, the victim would tell the defendant to stop, and he would. Otherwise, he would simply stop on his own and return to his bedroom. The victim did not tell anyone what had happened, did not know that these things were wrong, and just "accepted it."

After the Oregon trip, the victim continued spending time during the day, and sleeping overnight, at the defendant's house. In testifying about the rapes, the victim, in certain descriptions of the events, connected the rapes to the rooms in the house where the acts were done. There was a finished basement room that two of the defendant's sons used as a bedroom. On one night, the victim remembered lying on the floor near one of the boys' beds when the defendant came downstairs. As he knelt on the floor, the defendant first placed his fingers in the victim's vagina, and then separated her legs and put his tongue into her vagina, in the manner he had on the cross-country trip. The living room was the place of other rapes, again in which the defendant engaged in digital penetration of the victim's vagina and oral sex. (The defendant often slept in a chair in the living room because he had lymphedema, an ailment which causes swelling of his extremities, particularly his legs.)

In March, 2005, when the victim was fourteen years of age, there was a final indecent assault upon the victim. Just before

Easter, the victim, with her half-brother, stayed over at the defendant's house on a school night. As the victim was sleeping on the living room couch, close to midnight, the defendant, who had been in his chair, approached her. He began to place his fingers in her vagina. She told him that she had to be up early for school the next day. The defendant stopped and returned to his chair. However, a few hours later that night, the defendant approached again and began to climb on top of the victim. She placed her hands against his chest, pushed him away, and said no. The defendant stopped. Thereafter, the victim disclosed the defendant's acts, and an investigation followed.

In addition to her testimony describing the assaults upon her, the victim related a series of conversations she had had with the defendant, including his statements to her that: he had had similar experiences with the victim's stepmother; he had not had sex with his wife in twenty years; and he loved the victim so much that his wife was jealous.

The defendant testified. He denied the allegations. The defendant stated that he had not been present at his house during weekends, but rather was working on Cape Cod. He would, he said, leave his house in Carver on Wednesdays and stay on Cape Cod until Monday mornings. The defendant's wife testified that there was only one non-weekend night when the victim stayed at the defendant's house, and that this was a March, 2005, sleepover (which was the night of the final sexual assault with intent to rape). However, on cross-examination, the defendant's wife acknowledged that the victim may have slept over on a weeknight during the summers, and that the victim was at her house almost every day.

Another prong of the defense rested on the defendant's medical condition. The defendant testified that he cannot kneel for long periods of time, and that, if he does, he will require assistance standing upright, or it may take a couple of minutes for him to rise. It was suggested that this condition would have hindered the defendant from perpetrating the indecent acts described by the victim.

1. *The out-of State rapes.* a. *The jurisdictional issue.* As previously noted, two of the acts of rape, which were the predicates for the first two indictments, occurred outside Massachusetts. The

defendant challenges his convictions of these two crimes on the basis that the indictments were improperly returned in Massachusetts, and that our courts lacked jurisdiction to try him for these offenses. Given the lack of Massachusetts jurisdiction, the defendant contends, his constitutional rights were violated.[2]

"It is elementary that it must be shown that jurisdiction lodged in the courts of Massachusetts before the defendant can be found guilty of the offence charged." *Commonwealth* v. *Fleming*, 360 Mass. 404, 406 (1971). "Criminal laws have no extraterritorial validity. They will not be enforced outside the jurisdiction of the sovereign by whose authority they are enacted. That is a general principle." *Commonwealth* v. *Booth*, 266 Mass. 80, 84 (1929). "The general rule, accepted as 'axiomatic' by the courts in this country, is that a State may not prosecute an individual for a crime committed outside its boundaries." *Vasquez, petitioner*, 428 Mass. 842, 848 (1999). Accord *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 671 (1974) ("With reference to the question of jurisdiction, there can be no doubt that the judge had no power to try the defendant for crimes committed out of State"); *Commonwealth* v. *Gilbert*, 366 Mass. 18, 28 (1974) (the jurisdiction of a Massachusetts court depends on "[w]hether a criminal act occurred within the territorial boundaries of the Commonwealth").

Notwithstanding these jurisdictional principles, the Commonwealth submits on appeal that these two rapes were subject to prosecution in Massachusetts because they fall within a very limited exception allowing a State extraterritorial jurisdiction over a criminal offense: the "effects" doctrine, which was described by Justice Holmes in *Strassheim* v. *Daily*, 221 U.S. 280,

---

[2]The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." For purposes of the Sixth Amendment, the Commonwealth of Massachusetts comprises a single district. See *Commonwealth* v. *Duteau*, 384 Mass. 321, 331 (1981); *Commonwealth* v. *Faust*, 423 Mass. 298, 301-302 (1996). See also 28 U.S.C. § 101 (2000).

Article 13 of the Massachusetts Declaration of Rights provides that, "[i]n criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty, and property of the citizen."

285 (1911).[3] According to the Holmesian analysis defining this doctrine, "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect . . . ." *Ibid.* See the analysis of the effects doctrine in *Vasquez, petitioner,* 428 Mass. at 848-849, discussed *infra.*

For the reasons that follow, we determine that the effects doctrine is not applicable to these two out-of-Massachusetts extraterritorial rapes. The Commonwealth's invocation of the effects doctrine in this case would not only be in conflict with the aforesaid existing jurisdictional precedent, but also would be so expansive a reading of the effects doctrine as to stretch Massachusetts criminal law jurisdiction into a hitherto unrecognized realm.

Both Justice Holmes's Federal enunciation of the effects doctrine in *Strassheim* and the Massachusetts analysis of the doctrine in *Vasquez* arose in the context of habeas corpus challenges to extradition warrants, and focused on whether a crime had been committed within the jurisdiction of the requesting State from which the to-be-extradited defendant was a fugitive. In *Strassheim,* the issue was whether a Michigan indictment, for which the Illinois extradition warrant was requested, rested on predicate acts that occurred in Michigan. As Justice Holmes wrote, such predicate acts did occur in Michigan: "Thus in this case offering the bid and receiving the acceptance were material steps in the scheme, they were taken in Michigan, and they were established in their character of guilty acts when the plot was carried to the end . . . ." *Strassheim,* 221 U.S. at 285. These in-State acts of tendering a fraudulent bid and its acceptance were a part of the offense elements of the underlying crime of obtaining money by false pretenses. Therefore, Justice Holmes evidently reasoned that, although certain of the defendant's acts proving offense elements occurred outside Michigan, there was, nonetheless, jurisdiction in Michigan because the predicate acts proving offense elements occurring outside Michigan, coupled with the

---

[3]The prosecutor did not invoke the effects doctrine at trial, instead relying on G. L. c. 265, § 24A. See part 1.b, *infra.* Given that jurisdiction may be challenged at any time, and is challenged by the defendant in this appeal, we consider the applicability of the effects doctrine pressed by the Commonwealth on appeal.

in-State acts, were intended to produce, and did produce, detrimental effects directly within Michigan. In contrast, in this case, no predicate acts proving offense elements of the crime of rape occurred within Massachusetts. Rather, all acts in the out-of-State rapes in the camper were accomplished at some unknown place outside Massachusetts. Hence, unlike the in-State predicate acts involving the bid and acceptance offense elements of obtaining money by false pretenses in *Strassheim*, in the case at bar, no Massachusetts-based predicate act proving an offense element of the rapes occurred within Massachusetts, and under the effects doctrine, the out-of-State acts, standing alone, cannot be deemed to have been intended to produce a direct detrimental effect within Massachusetts.[4] We do not read *Strassheim* as making the effects doctrine so broad as to empower a State to exercise jurisdiction where all acts in furtherance of the crime and all offense elements of the crime are committed wholly outside the borders of the State.

The analysis by the Supreme Judicial Court in *Vasquez* leads to the same conclusion. Similarly to *Strassheim*, the *Vasquez* case presented an extradition issue, there concerning validity of a Massachusetts extradition warrant issued upon a request from Oregon based upon the petitioner's indictment for criminal nonsupport of his children. *Vasquez, petitioner*, 428 Mass. at 842-843. The petitioner contended that the requesting State of Oregon had no jurisdiction over the crime. This was so, the petitioner argued, because he lived in Massachusetts, where the support

---

[4]Illustrative of the kind of cases in which proof of in-State predicate acts linked to an offense element will confer jurisdiction in Massachusetts — even if other acts in furtherance of the crime transpire outside Massachusetts — are *Commonwealth* v. *Carroll*, 360 Mass. 580 (1971), and *Commonwealth* v. *White*, 123 Mass. 430 (1877). Citing *Strassheim*, the court in *Carroll* held that because the offense of receiving stolen goods required proof that the defendants "did receive and aid in the *concealment* of" stolen property, and because "[t]he evidence supports an inference that at least the concealment aspect of the crime occurred in Springfield[,] the crime may be punished in Massachusetts." *Carroll, supra* at 585, quoting from G. L. c. 266, § 60. This was so even though other acts relevant to the stolen goods offense occurred in New York. The *Carroll* court cited *White*, where the court had held that there would be a similar jurisdictional basis for "the crime of larceny, which includes the element of asportation, [and which] may be punished in Massachusetts if the thief brings the stolen goods into this State after acquiring them outside the jurisdiction." *Carroll, supra*. See *White, supra* at 433.

order had issued, whereas the resulting indictment for failure to pay under the support order was returned in Oregon, the State to which his former wife and children had moved, and in which he had never set foot. The Supreme Judicial Court rejected a habeas corpus challenge to the extradition warrant, on the basis that after extradition the petitioner would have the right to process of law to litigate a jurisdictional challenge to the Oregon indictment. *Id.* at 847. The court deemed the deprivation of the petitioner's liberty under the warrant to be proper unless "Oregon's requisition were egregiously devoid of even a colorable claim of legislative jurisdiction." *Ibid.* Of import to the instant case, the *Vasquez* court then proceeded with its analysis under "[t]he general rule, accepted as 'axiomatic' by the courts in this country, [which] is that a State may not prosecute an individual for a crime committed outside its boundaries." *Id.* at 848, citing *Nielsen* v. *Oregon*, 212 U.S. 315, 321 (1909), and *Huntington* v. *Attrill*, 146 U.S. 657, 673 (1892). Invoking the exception to the general rule, the *Vasquez* court viewed the effects test as a basis for the lawful exercise of criminal jurisdiction by Oregon, "on the theory that, although the offending parent was outside the State at the time he committed the crime, the detrimental effect occurred where the child[ren] resided." *Vasquez, petitioner, supra* at 849.

In this case, the Commonwealth's argument is that Massachusetts jurisdiction spreads so far as to envelop these out-of-State criminal acts because the defendant and the victim are Massachusetts residents, left this State together (with other family members), and returned to Massachusetts where the defendant continued his sexual abuse of the victim.[5,6] But this pattern of

---

[5]The Commonwealth argues that support for its extrajurisdictional argument may be found by analogy in criminal statutes enacted by the Legislature that extend Massachusetts jurisdiction over acts which occur outside our State. However, the statutes the Commonwealth cites are distinguishable because in each a predicate act or offense element must take place or be satisfied within Massachusetts. See, e.g., G. L. c. 277, § 61 (if mortal wound given, other violence or injury inflicted, or poison administered on high seas or on land within or without Commonwealth, but death occurs within Massachusetts, homicide may be prosecuted in Massachusetts); G. L. c. 277, § 62 (if mortal wound given, other violence or injury inflicted, or poison administered within Massachusetts, even if death occurs outside Massachusetts, homicide may be prosecuted in Massachusetts).

[6]The Commonwealth in a passing argument suggests that jurisdiction should lie in Massachusetts because "no other [S]tate would have an interest in pros-

potentially recurring criminal acts is a fact pattern theoretically present in a host of out-of-Massachusetts offenses committed by a putative resident defendant who leaves this State with a person against whom the putative defendant commits criminal acts outside Massachusetts, only to return to Massachusetts and continue to engage in criminal acts against the same person. The effects doctrine does not have so all-encompassing a reach.

In conclusion, the extraterritorial limitation on a State's jurisdictional power to reach and prosecute crimes committed outside its borders, in our view, defeats the Commonwealth's contentions in this case. The effects doctrine does not save the jurisdictional defect in this case with respect to the first two rape indictments.[7]

b. *The venue statute.* The Commonwealth also invokes G. L. c. 265, § 24A,[8] as a jurisdictional basis. But that statute deals

---

ecuting the defendant [as] the victim could not establish the [S]tate in which the rapes occurred" and because the Federal government "has made no effort to prosecute the defendant." We reject this proposition. The Commonwealth has pointed to nothing in the record to establish whether any investigation was even undertaken to identify the State outside Massachusetts where the crimes were enacted, or that any effort was made to involve Federal authorities. That an investigation may not have been pursued to develop evidence concerning the State in which the crimes were committed, and that the Federal government has not opened a case — indeed may not even have been notified of an interstate crime — does not ipso facto confer jurisdiction on the Commonwealth.

[7]Cases which the Commonwealth cites for the proposition that the effects doctrine has been applied to confer jurisdiction upon a State even though a sexual crime occurred outside that State are distinguishable because they involve international law issues and jurisdiction over world waterways. See, e.g., *United States* v. *Neil*, 312 F.3d 419, 420, 422 (9th Cir. 2002) (foreign national sexually assaulted California minor in Mexican waters on ship that started and ended cruise in California); *United States* v. *Roberts*, 1 F. Supp. 2d 601, 607-608 (E.D. La. 1998) (foreign national sexually abused United States citizen on international waters aboard foreign ship that began and ended cruise in United States); *State* v. *Jack*, 125 P.3d 311, 321-322 (Alaska 2005) (defendant sexually assaulted Alaska citizen aboard Alaska ferry in Canadian waters); *State* v. *Stepansky*, 761 So. 2d 1027, 1029, 1035-1036 (Fla.), cert. denied, 531 U.S. 959 (2000) (sexual battery against United States citizen 100 nautical miles from Florida coast on foreign cruise ship that began and ended voyage in Florida).

[8]General Laws c. 265, § 24A, as appearing in St. 1983, c. 200, provides, in pertinent part, as follows.

"If . . . the person against whom said crime is alleged to have been committed has been conveyed from one county or judicial district into another, said crime may be alleged to have been committed, and may

only with venue, and does not confer jurisdiction. Specifically, § 24A conveys dual venue for trial of a crime in which a victim is transported within Massachusetts from one county to another in order to commit the crime. See *Commonwealth* v. *Libby*, 358 Mass. 617, 619-620 & n.2 (1971); *Commonwealth* v. *Dineen*, 70 Mass. App. Ct. 1, 3 (2007).

2. *The offense element of force in the remaining rape charges.* The defendant also claims that the Commonwealth failed to introduce sufficient evidence concerning the element of force required for the offense of rape of a child by force. See G. L. c. 265, § 22A; *Commonwealth* v. *Thayer*, 418 Mass. 130, 132 (1994). This claim is unavailing. Under the governing standard, viewing the totality of the evidence in the light most favorable to the Commonwealth, we conclude that the evidence sufficiently proved the element of force. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979).

Proof of the force element of rape under G. L. c. 265, § 22A, may be established by physical force or constructive force. "[I]n this Commonwealth, unless the putative victim has been rendered incapable of consent, the prosecution must prove that the defendant compelled the victim's submission *by use of physical force*; *nonphysical, constructive force*; or threat of force" (emphasis added). *Commonwealth* v. *Lopez*, 433 Mass. 722, 728-729 (2001). See *Commonwealth* v. *Helfant*, 398 Mass. 214, 220-222 (1986); *Commonwealth* v. *Caracciola*, 409 Mass. 648, 653 (1991). In this case, the rape convictions are sustainable on both the physical force and constructive force theories of proof.

a. *Physical force.* The evidence demonstrated actual physical force inflicted upon the victim by the defendant in those digital rapes during which the physical intrusion of penetration was perpetrated while the young victim was asleep. "[I]t has been held that, if a man has carnal intercourse, using so much force as is necessary, with a woman who is incapable of consenting, by reason of sleep . . . he may be convicted of rape." *Commonwealth* v. *Roosnell*, 143 Mass. 32, 40 (1886). Accord *Commonwealth* v. *Fionda*, 33 Mass. App. Ct. 316, 321-323 (1992) (correct jury instruction that if, by reason of sleep, victim is incapable of

be prosecuted and punished, in the county or judicial district where committed or from which such person was so conveyed."

consenting, then sexual act is done without valid consent of victim); *Commonwealth* v. *Moniz*, 43 Mass. App. Ct. 913, 913-914 (1997) (sufficient force where penetration was accomplished without opportunity for victim to resist). See *Commonwealth* v. *Feijoo*, 419 Mass. 486, 493 (1995); *Commonwealth* v. *Vasquez*, 55 Mass. App. Ct. 523, 534-536 (2002).

Actual force was also present in the oral rapes, where the defendant pulled the victim's legs apart and positioned himself against her spread legs while he engaged in oral sex.

b. *Constructive force.* The convictions would be sustainable in any event under the alternative theory of proof of nonphysical constructive force. See *Commonwealth* v. *Lopez, supra.* Among the spectrum of factors which may be considered on the question of the sufficiency of the evidence proving constructive force in accomplishing a rape against a child is the historical and contextual relationship between the victim and the defendant, as well as the manner and means by which the rape is perpetrated, which factors, among others, bear on whether the victim's ability to resist the rape was overborne or negated. In essence, the focus is on the circumstances "in which the victim is placed, the impact of those circumstances . . . on the victim's power to resist and the defendant's conduct[,] all [of which] are relevant to the determination whether conduct complained of by the victim was accomplished *by force* and against the victim's will." *Caracciola*, 409 Mass. at 651.

In this case, a confluence of circumstances yielded sufficient evidence of constructive force upon the vulnerable victim who was the object of the defendant's digital and oral intercourse against her will and without any meaningful power to resist. The defendant took advantage of the young victim as she slept in his house, where the defendant was an authority figure, and the victim was in the care of the defendant and his wife. The defendant gained an additional advantage over the victim because the victim was his step-niece, and she trusted him. There was a great disparity in age between the defendant and the young victim, and the defendant, a much larger person than the victim, would have a commanding physical presence. "By looking to the child's age and size, a [fact finder] could reasonably have inferred that the sexual intercourse took place by force and against her consent." *Commonwealth* v. *Melchionno*, 29 Mass. App. Ct. 939, 941 (1990).

The defendant argues that such factors still do not add up to the level of constructive force, because the victim stated that she was not threatened by the defendant and was not scared by him. However, that the young victim denied fear, and instead sought to suppress the effects of the rapes by pretending to sleep during the rapes, professing to accept the continual assaults as acts which "didn't affect me" because she was so young that she "didn't think anything was wrong with it [and] just accepted it," does not mean that the evidence was not sufficient to show that the rapes were committed against the victim's will, or that her power to resist was not overborne by the defendant. See *Commonwealth* v. *Sherry*, 386 Mass. 682, 688 (1982); *Commonwealth* v. *Caracciola*, *supra*. Indeed, that the victim endured the rapes with resignation and with no will to resist the defendant's sexual exploitation is reflective of the very nature of the application of constructive force with respect to the crime of rape of a young person.

3. *The medical records issue.* The defendant claims that there was error in the admission of the victim's medical records because the records were not redacted to exclude hearsay statements referring to the defendant as the perpetrator of the sexual assaults, and to delete statements in the records that sexual crimes had been committed. In related complaints, the defendant criticizes the prosecutor's closing argument, which included comments about the victim's statements in the unredacted records, and objects that the trial judge reviewed the records.

The defendant agreed to the admission of the records, and did not request any limitation on their use.[9] Moreover, the defendant stated no objection to the prosecutor's argument or to the trial judge's statement that she intended to read the records. Hence, we review to determine whether any error gave rise to a substantial risk of a miscarriage of justice.

Given the stipulated admission, it is hard to see error. But, even addressing the second level of review concerning whether any error led to a substantial risk of a miscarriage of justice, we

---

[9]We note there were references in the medical records to information potentially helpful to the defense — perhaps accounting for defense counsel's stipulation to their introduction. For example, the records described the victim as referring only to fondling, referenced "no penetration," and included a statement that the defendant did not threaten the victim.

discern no such risk in the prosecutor's references or in the trial judge's review of the records.

First, as previously noted, the medical records were admitted with the defendant's agreement. Second, the entries in medical records documenting the victim's medical history and treatment at the hospital, medical opinions, and diagnosis were admissible under G. L. c. 233, § 79G. See *Commonwealth* v. *DiMonte*, 427 Mass. 233, 241-242 (1998); *Commonwealth* v. *McCready*, 50 Mass. App. Ct. 521, 523 (2000). Third, the prosecutor's references to the victim's hearsay statements were neither extensive nor extreme, but rather were limited to highlighting the consistency in the victim's description of the rapes. Fourth, the trial judge, who was the fact finder, is presumed to know the law and could read the records without being unduly influenced by any hearsay statements appearing in the unredacted medical records. See *Commonwealth* v. *Batista*, 53 Mass. App. Ct. 642, 648 (2002) ("A trial judge sitting without a jury is presumed, absent contrary indication, to have correctly instructed [her]self as to the manner in which evidence is to be considered in [her] role as factfinder").

4. *Conclusion.* On the first two charges of rape of a child by force, the judgments are reversed, the guilty findings are set aside, and the indictments are to be dismissed. The judgments of conviction on the remaining indictments are affirmed, and the matter is remanded accordingly for resentencing.

*So ordered.*