NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-524

COMMONWEALTH

vs.

DAUDAH MAYANJA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

A Superior Court jury convicted the defendant of two counts of rape. On appeal the defendant argues that the trial judge erred by failing to instruct the jury on the meaning of constructive force and that the evidence was insufficient to show that he used constructive force to accomplish the rapes. While we conclude that the evidence was sufficient, we agree with the defendant that the judge's failure to define constructive force created a substantial risk of a miscarriage of justice, entitling him to a new trial. We therefore vacate the convictions.

Background. We summarize the evidence in the light most favorable to the Commonwealth. In March 2019 the victim

celebrated her twenty-first birthday.  She and her friend Rhonda[1] left their apartment in Brighton around noon and spent the rest of the day shopping and dining at various restaurants and bars. The victim smoked "a little bit" of marijuana and had several alcoholic drinks throughout the afternoon and evening.  Around 10 or 10:30 P.M., the two women went with some other friends to a restaurant in Somerville, where the victim had one drink and appetizers.  Shortly after midnight, the victim decided to return to her apartment to meet her boyfriend.  Rhonda wanted to stay out, so the victim ordered a car using the Uber ride-sharing application.  At that point the victim was not very intoxicated because she had been eating food while drinking.

When the car arrived, the victim confirmed that its appearance and that of the driver, later identified as the defendant, matched the information shown in the Uber application on her phone.  The victim then entered the backseat of the car, and the trip began at 12:21 A.M.  Not long after, the victim asked to move to the front seat because she felt carsick.  The defendant pulled over so that the victim could change seats, and, once she was in the front seat with a seatbelt on, they began to talk.  The defendant asked the victim if she had any marijuana with her.  She replied that she did not and asked the

_____

[1] A pseudonym.

2

defendant if he ever smoked while driving for Uber.  He said yes, and "then [they] just kept talking."  At some point the defendant learned that it was the victim's birthday.

The defendant started to flirt with the victim and put his right hand on her shoulder while driving down Storrow Drive. The defendant told the victim that she was "beautiful" and "pretty" and that "this is how [she] should celebrate [her] birthday."  He moved his hand down the victim's arm, onto her thigh, and then to the belt on her pants.  The victim "was frozen" and "did nothing" and "said nothing."  After undoing the victim's belt, the defendant put his hand inside her pants and underwear and inserted one finger into her vagina.  He continued to talk, but the victim could not focus on what he was saying because she was "scared."  The victim "stayed quiet" and felt that "[t]here was nowhere to go or nothing to do."

As the car approached the Hatch Memorial Shell on Storrow Drive, the defendant removed his finger so that he could pull over and park.  The defendant stated, "[W]e're going to pull over here.  Nobody has to know."  Once parked in a "pretty dark" area, the defendant reinserted his finger into the victim's vagina.

At this point, now 12:37 A.M., the victim received a phone call from Rhonda's boyfriend, Seth.[2]  The victim told the defendant, "[H]ang on, my friend's calling me.  I'm going to step outside and take this.  I'm sure he just wants to wish me a happy birthday."  The victim opened the car door, grabbed her purse, and started running toward the river while on the phone with Seth.  She told Seth that her Uber driver tried to rape her and kept running until she slipped and fell.  A passerby, who saw the victim fall, stayed with her until Seth arrived at 12:49 A.M.  The defendant's car pulled out of the area around the same time that Seth's car pulled in.  When the victim got into Seth's car, she was crying and "in shock," and Seth perceived that she was "absolutely distraught."

Seth drove the victim to a police station where she reported what happened.  While the victim was speaking with police, she received a phone notification from Uber that she had left a bag in the defendant's car.  The police then called the defendant through the Uber application on the victim's phone and asked him to come to the station, which he did.  After being advised of his Miranda rights, the defendant agreed to participate in a recorded interview.  The defendant stated during the interview that the victim was "acting weird" and

_____

[2] A pseudonym.

4

became "agitated" when he told her not to smoke in his car; the defendant parked the car "for safety," and the victim ran away. The defendant denied touching the victim, stating it was "a hundred percent against [Uber] policies" to touch a passenger.

Discussion. 1. Jury instruction. To establish the crime of rape, the Commonwealth must "prove beyond a reasonable doubt that the defendant committed (1) sexual intercourse (2) by force or threat of force and against the will of the victim." Commonwealth v. Lopez, 433 Mass. 722, 726 (2001). See G. L. c. 265, § 22 (b). This second element "has been interpreted 'as truly encompassing two separate elements': force or threats, and lack of consent." Commonwealth v. Sherman, 481 Mass. 464, 471 (2019), quoting Lopez, supra at 727. To establish "force or threats," the Commonwealth must prove in turn "that the defendant committed sexual intercourse . . . by means of physical force; nonphysical, constructive force; or threats of bodily harm, either explicit or implicit" (citations omitted). Lopez, supra at 727.

As the parties agree, to sustain the convictions here, the Commonwealth had to show that the defendant committed sexual intercourse by means of constructive force, as there was no evidence that he used physical force or made threats of bodily harm. At trial the judge correctly instructed the jury that "[t]he force needed for rape may, depending on the

5

circumstances, be constructive force as well as physical force, violence or threat of bodily harm."  After then explaining that the Commonwealth must also prove that the victim did not consent, the judge instructed the jury as follows:

> "If a person submits because of fear, it is not consent. The person must be free to exercise her will without restraint.  You may consider evidence of the complainant's state of mind at the time of the alleged incident on the issue of consent."

> "The complainant is not required to use physical force to resist.  However, you may consider evidence of any attempt to restrain or confine the complainant [or] violence by the defendant or of struggle or outcry by the complainant on the issues of force and consent."

> "However, lack of such evidence does not necessarily imply consent or the absence of force because in certain circumstances physical resistance may not be possible."

> "You may consider all of the circumstances and the entire sequence of events in determining whether the intercourse was without the complainant's consent and her ability to resist."

This was the totality of the instruction on the second element of rape.  Although the defendant did not object to it at trial, he now argues that the judge erred by failing to define constructive force and that this failure created a substantial risk of a miscarriage of justice.  On the facts of this case, and given the theory argued by the Commonwealth, we agree.

A trial judge has the obligation "to instruct the jury on all aspects of pertinent law applicable to issues raised in the case," which includes explaining "technical terms where their

6

meaning is obscure and there is a possibility of confusion." Commonwealth v. Allen, 54 Mass. App. Ct. 719, 724 (2002). The instruction here was defective because it left the jury to speculate on the meaning of constructive force, a "technical matter[] with which lay[people] cannot be expected to be familiar." Commonwealth v. White, 353 Mass. 409, 425 (1967). Without a definition of constructive force, the instruction "fell short of providing a comprehensible standard to guide" the jury in determining whether the Commonwealth had satisfied its burden of proof. Id. See Commonwealth v. Niziolek, 380 Mass. 513, 527 (1980) (judge erred by failing to define "malice," an element of crime of arson, and instead instructing jury to apply its "ordinary meaning in criminal law"); White, supra (instruction "defective in failing to define the respective elements of robbery and breaking and entering," where distinction determinative as to degree of murder); Allen, supra (judge erred by failing to define "telecommunication services" and instead instructing jury to rely on their "own common sense and experiences of life"); Commonwealth v. Walter, 40 Mass. App. Ct. 907, 909 (1996) (judge erred by failing to define "felony," as used in context of "intent to commit a felony," an element of crime charged).

We do not agree with the Commonwealth's assertion that the judge adequately conveyed the meaning of constructive force by

7

telling the jury that they could "consider evidence of any attempt to restrain or confine the complainant . . . on the issues of force and consent."  Constructive force requires proof that the defendant committed the sexual intercourse by means of words or conduct that created an intimidating environment or instilled fear in the victim, with the "ultimate question" being "whether 'the defendant compelled the victim to submit.'" Commonwealth v. Testa, 102 Mass. App. Ct. 149, 152 (2023), quoting Commonwealth v. Oquendo, 83 Mass. App. Ct. 190, 194 (2013).  See Commonwealth v. Caracciola, 409 Mass. 648, 655 n.10 (1991) (constructive force established by evidence "that the intercourse resulted from the coercive atmosphere and fear of the complainant as a result of the words and conduct of the defendant"); Commonwealth v. Newcomb, 80 Mass. App. Ct. 519, 521 (2011) ("Constructive force may be by threatening words or gestures and operates on the mind to instill fear in the victim in order for the defendant to achieve his goal" [quotation and citation omitted]).  That the jury were told they could "consider evidence of any attempt to restrain or confine the complainant" (even assuming the evidence could be interpreted in that way) was inadequate to convey these principles.[3]

---

[3] By comparison, the Superior Court model jury instruction on constructive force provides:

We thus turn to whether the deficiency in the instruction created a substantial risk of a miscarriage of justice, the standard applicable to unpreserved errors in noncapital cases. See Commonwealth v. Desiderio, 491 Mass. 809, 815-816 (2023). "The substantial risk standard requires us to determine if we have a serious doubt whether the result of the trial might have been different had the error not been made" (quotation and citation omitted). Id. To decide this question, we are guided by the four-factor formulation set out in Commonwealth v. Alphas, 430 Mass. 8, 13 (1999). See Desiderio, supra at 816, 820.

Because the case turned on whether the defendant accomplished the rapes by constructive force, we conclude that the incomplete instruction gave rise to a substantial risk of a miscarriage of justice. "The jury could not determine, without

> "Constructive force may be by threatening words or gestures and operates on the mind to instill fear in [the complainant] in order for the defendant to achieve his goal. There must be proof that [the complainant] was afraid or that [the complainant] submitted to the defendant because his conduct intimidated her."

> "You may consider all of the circumstances, including the respective age and size of the parties, and the overall relationship between the parties, including whether the defendant was an authority figure in determining whether the rape was by force and against [the complainant's] will."

Massachusetts Superior Court Criminal Practice Jury Instruction § 3.1.1 (a) (Mass. Continuing Legal Educ. 2018).

knowing what [force] meant in the context of this case, whether the Commonwealth had carried its burden of establishing the existence of this element beyond a reasonable doubt." Niziolek, 380 Mass. at 527. See Allen, 54 Mass. App. Ct. at 725 (instruction created substantial risk of miscarriage of justice where it did not adequately define element of crime, leaving jury to speculate as to whether Commonwealth met burden of proof); Walter, 40 Mass. App. Ct. at 910 (similar). As the defendant points out, the instruction created the risk, among others, that the jury would impermissibly find the force element to be satisfied based solely on the fact that force was needed to accomplish the penetration. See Lopez, 433 Mass. at 728 (unless victim incapable of consent, force necessary for rape must be more than that inherent in act of penetration). Furthermore, as discussed below, while the Commonwealth's evidence of constructive force was sufficient, it was not strong. We therefore conclude that the error may have materially influenced the jury's verdict, requiring that the convictions be vacated.

2. Sufficiency. We address the defendant's challenge to the sufficiency of the evidence of constructive force for purposes of determining whether he can be retried. While a close question, we conclude that a rational juror viewing the evidence in the light most favorable to the Commonwealth could

10

have found sufficient proof of constructive force.  See Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

As we have stated, constructive force exists when the defendant's words or conduct creates an intimidating environment or instills fear in the victim, compelling the victim to submit. A jury is therefore to examine "the circumstances or fear in which the victim is placed" and "the impact of those circumstances or fear on the victim's power to resist." Caracciola, 409 Mass. at 651.  Relevant circumstances may include (1) any threatening words or conduct, which need not be of a "direct and immediate nature," Commonwealth v. Dumas, 83 Mass. App. Ct. 536, 539 (2013); (2) whether the defendant was in a position of authority or had control over the victim, see Commonwealth v. Wallace, 76 Mass. App. Ct. 411, 417-418 (2010); (3) any age or size difference between the defendant and victim, see Commonwealth v. Armstrong, 73 Mass. App. Ct. 245, 255 (2008); and (4) the "manner and means by which the rape [was] perpetrated," id.  Cf. Commonwealth v. Feijoo, 419 Mass. 486, 493 (1995) (rape was "without warning and therefore without [the victim's] having had an opportunity to consent or object").

Here, had the jury been properly instructed, we believe they could have found proof of constructive force beyond a reasonable doubt.  The victim was alone with the defendant, a male Uber driver she had met only minutes earlier and whom she

11

hired for the sole purpose of driving her from one place to another. It was nighttime, and the defendant was in control of the car. When the defendant moved his hand toward the victim's belt, she became "frozen" but "did nothing" and "said nothing"; she did not "attempt to push him away" because she "thought the belt and the seatbelt would have been enough." When the defendant nevertheless continued, undoing her belt and putting his hand inside her pants, the victim "stayed quiet" because "[t]here was nowhere to go or nothing to do." She later told the jury that the reason she did not get out of the car when the defendant put his finger inside her was that "[t]he car was . . . driving on Storrow Drive probably over [sixty] miles per hour and [she] had nowhere to go." The defendant then drove to a dark area off the road and penetrated the victim a second time.

Based on these facts, and where the victim testified that she was "scared," a rational juror could have found that the victim submitted to the defendant because "she was fearful of what would happen if she did not." Commonwealth v. Vasquez, 462 Mass. 827, 846 (2012). It would have been rational to infer, among other possible inferences, that the victim feared she would be seriously injured if she tried to get out of the moving car. The jury could have found that the defendant's escalating

12

acts of touching her under these circumstances were what created that fear and caused her to submit.

We are unpersuaded by the defendant's contention that the victim's failure to resist or object to his conduct required the jury to find that he did not use force.  The victim's lack of response "could have been interpreted by the jury as supporting a finding that [she] was indeed fearful."  Vasquez, 462 Mass. at 847.  In fact, the victim testified that she "was frozen." Drawing on their own experiences, the jury could have found that the victim would not have expected her Uber driver to engage in physical contact and that she did not respond to the defendant's touching her because of the intimidating environment he created by assaulting her when she had no safe means of escape.

The defendant is also not helped by pointing to the absence of evidence that he threatened the victim, tried to take her cell phone, or tried to prevent her from leaving the car.  The question is whether the evidence presented at trial permitted the jury to find that the defendant intimidated or instilled fear in the victim, compelling her to submit.  We conclude that

13

the evidence supported such a finding, leaving the Commonwealth free to retry the defendant if it so chooses.

Judgments vacated.

Verdicts set aside.

By the Court (Sacks, Shin & D'Angelo, JJ.[4]),

*Joseph F. Stanton*

Clerk

Entered:  August 10, 2023.

---

[4] The panelists are listed in order of seniority.