## COMMONWEALTH vs. LAURA RYAN.

No. 09-P-1789.

Middlesex. January 19, 2011. - March 29, 2011.

Present: GRASSO, TRAINOR, & MILKEY, JJ.

*Statute*, Construction. *Contract*, Credit card. *Larceny. Fraudulent Use of Credit Card. Practice, Criminal,* Instructions to jury. *Words,* "Debit card," "Common and notorious thief."

At a criminal trial, there was sufficient evidence to support the defendant's conviction of fraudulent use of a credit card, in violation of G. L. c. 266, § 37C(e), where the evidence amply established that the defendant, without the victim's knowledge or consent, and with intent to defraud, used the victim's debit card to make purchases of goods and services, and where, for purposes of G. L. c. 266, §§ 37A-37C, a debit card amounts to the functional equivalent of a credit card. [183-186]

At a criminal trial, the judge did not err in adjudging the defendant a common and notorious thief, where the defendant, having previously been convicted on an indictment charging larceny, was again convicted on an indictment charging larceny. [186-187]

At a criminal trial in which the Commonwealth proceeded on a theory that the defendant used the victim's debit card as a continuing course of conduct comprising a single criminal episode that, in the aggregate, amounted to larceny and fraudulent use of a credit card in excess of $250, the judge did not err in declining to give a specific unanimity instruction, where there was no danger of juror confusion, given that none of the individual instances of theft, save one, exceeded the statutory minimum of $250. [187]

At the trial of an indictment charging, inter alia, credit card fraud, the judge's jury instruction adequately apprised the jury of the requisite elements, including the requirement that the Commonwealth prove that the defendant's use of the credit card was without the consent of the victim and with the intent to defraud her. [187-188]

At a criminal trial, there was no error in the admission of evidence of the defendant's status as a work-release inmate, given that her status was inextricably intertwined with the facts of the case and essential to the jury's understanding of all the circumstances; further, the judge did not abuse his discretion in admitting, as evidence of consciousness of guilt, testimony from the defendant's employer regarding her differing explanations for her use of the victim's credit card; moreover, to the extent that it was error to permit a witness to testify that the defendant's employment was terminated because she used the victim's credit card, nothing in the admission of the testimony was so prejudicial as to warrant reversal of the defendant's convictions. [188]

INDICTMENTS found and returned in the Superior Court Department on October 24, 2006.

The cases were heard by *Raymond J. Brassard*, J.

*Andrew S. Crouch* for the defendant.

*Shirley X. Li Cantin*, Assistant District Attorney, for the Commonwealth.

GRASSO, J. After a jury found the defendant Laura Ryan guilty of larceny over $250, fraudulent use of a credit card, and identity fraud, a judge sitting without a jury adjudged her a common and notorious thief. See G. L. c. 266, § 40. On appeal, the defendant contends that (1) the evidence was insufficient to sustain a conviction of credit card fraud pursuant to G. L. c. 266, § 37C. She also argues that the judge erred in (2) adjudging her a common and notorious thief, (3) not providing a specific unanimity instruction, (4) instructing on credit card fraud, and (5) admitting evidence that the defendant was on work-release. We affirm.[1]

1. *Background.* We highlight the pertinent facts that the jury could have found. Lindsay Sullivan Morales worked in the business development center at Bernardi Honda (Bernardi) in Natick. There, Morales met and befriended the defendant, who began working as a receptionist in February, 2006, under a work-release program for prerelease inmates committed to the Massachusetts Correctional Institution at Framingham (MCI Framingham).

Morales and the defendant became close friends. Morales, who was only 21 years old, viewed the defendant as a "mother figure" and trusted her. The defendant told Morales that she was not living with her husband and children but was in prison because her boss had been trading stocks and bonds illegally.

One day in April, 2006, Morales noticed that the defendant was upset and asked what was wrong. The defendant told Morales that the cellular telephone company had shut off her husband's

---

[1]The Commonwealth concedes, and we agree, that we must vacate the defendant's sentence for larceny over $250 as that sentence must be part of a single, consolidated judgment as a common and notorious thief. See *Collins* v. *Commonwealth*, 315 Mass. 167, 169 (1943) (sentence for underlying larceny conviction must be part of single consolidated judgment as common and notorious thief); *Commonwealth* v. *Clark*, 53 Mass. App. Ct. 342, 348 (2001) (offense of being common and notorious thief one of high and aggravated character justifying enhanced punishment and consolidation of multiple convictions into one judgment).

telephone service because he had supplied the wrong bank information. She told Morales that she did not have a credit card of her own and needed one so the telephone could be reconnected. The defendant convinced Morales to allow her to use Morales's debit card, issued by Middlesex Savings Bank and bearing a Visa logo, as a form of surety for the telephone company. She promised that no charges would accrue to Morales. The defendant then wrote Morales's debit card number on a scrap of paper.[2] Morales thought this strange, but the defendant assured her that she only wrote it down "in case [the transaction] doesn't go through" so that "I don't have to keep bugging you for your card."

About a week later, the defendant complained to Morales that she felt uncomfortable because she did not look professional enough in the uniform that the work-release program required her to wear. Although Morales assured the defendant that she looked fine, the defendant told Morales that she was going to order some clothing from Chadwick's, an on-line clothing store, and she asked Morales if she could have the clothes sent to Morales's house because she did not know when she would be seeing her husband. Morales agreed, and when the clothing arrived, she brought it to Bernardi and gave it to the defendant.

Subsequently, the defendant convinced Morales to make a purchase from Chadwick's despite Morales's reluctance to purchase clothing for herself until she had done so for her daughters. The defendant then suggested that since she was going to place another order for herself using her husband's credit card, she and Morales should place their separate orders at the same time and have both delivered to Morales's address as before. Morales acquiesced, and the defendant purported to place both orders.

About one week later, on May 7, 2006, the defendant's scheme began to unravel when Morales overheard the defendant placing a telephone order for a pizza using Morales's debit card information. Not wanting to confront the defendant without proof, Morales decided to wait until a charge was posted to her account. Two days later, when Morales's bank statement reflected a charge of $50.62 from Pizza Plus, she questioned the defendant,

---

[2]Although only Morales's name appeared on the card, she and her husband shared the bank account to which the card was linked. Every purchase made with the card was debited from that account, and it usually took two days for a charge to post and for the funds to be removed from the account.

who responded that she was sorry and must have confused her husband's credit card number with Morales's debit card number.

Alarmed at what was occurring, Morales telephoned Chadwick's and learned that rather than two separate orders there was but a single order in Morales's name alone for $1,200.[3] Morales was distraught at this discovery and immediately telephoned her bank. As Morales was going through each charge with a bank representative, the defendant walked into the room. The defendant began to rub Morales's back and asked her, "What's the matter? Did I do something wrong? Did I mess something up? We're friends. I'm so sorry."

Morales confronted the defendant and expressed her displeasure with what the defendant was doing. The defendant implored, "We're best friends. I love you. You can't do this to me. You can't send me back to jail. You can't take me away from my kids. Don't do this to me. I'm sorry. I'll pay you back every penny." Their confrontation ended when the van arrived to transport the defendant back to MCI Framingham. Before she left, the defendant again implored Morales not to tell anybody. A short time later, the defendant telephoned Morales from the institution and again importuned her not to tell anyone.

The next day, Morales went to the bank and reported the unauthorized charges. In addition to the charge to Chadwick's,[4] the defendant had used Morales's debit card without Morales's consent to make the following purchases:

(1) April 12, 2006, $223.10 from Sprint telephone;

(2) April 14, 2006, forty dollars from the Registry of Motor Vehicles;

(3) April 20, 2006, $135.49 from Verizon.com;

(4) May 3, 2006, $37.50 from Captive Images; and

(5) May 9, 2006, $50.62 from Pizza Plus.[5]

---

[3]Morales estimated that her order amounted to no more than $300.

[4]Because many of the Chadwick's items were back-ordered, only $511 was charged to Morales's debit card, $257.50 of which was for Morales's order and $263.57 for the defendant's.

[5]The jury heard further that the next day the defendant arranged for an

2. *Sufficiency of the evidence of credit card fraud.* As pertinent here, G. L. c. 266, § 37C(*e*), as amended by St. 1987, c. 468, § 3, provides, "Whoever, with intent to defraud . . . obtains money, goods or services or anything else of value by representing without the consent of the cardholder that he is said cardholder . . . , where the value of money, goods or services obtained . . . is in excess of two hundred and fifty dollars . . . shall be punished." The evidence just summarized amply established that, without Morales's knowledge or consent and with intent to defraud, the defendant used Morales's debit card to make purchases of clothing, a mobile telephone, telephone services, food, and Registry of Motor Vehicle services, in excess of $250. The defendant argues, notwithstanding, that the Commonwealth presented insufficient evidence to support conviction of fraudulent use of a credit card under G. L. c. 266, § 37C(*e*), because the instrument used was Morales's "debit card" rather than her "credit card." The defendant contends that because the debit card drew upon Morales's own funds at the bank, the transaction lacked the requisite obtaining of goods or services "on credit" to support conviction. Viewing the governing statutes in context and in their entirety, we disagree. See *Commonwealth* v. *Roucoulet*, 413 Mass. 647, 650, 653 (1992) (court must view statute in its entire context, not construing it to defeat obvious intention of Legislature or manufacturing ambiguity to invoke rule of lenity to defeat that intent); *Commonwealth* v. *Kneram*, 63 Mass. App. Ct. 371, 376-377 (2005).

General Laws c. 266, §§ 37A-37C, render unlawful the misuse and fraudulent use of any instrument or device, however denominated, issued by a business organization or financial institution[6] to facilitate the movement of money, goods, services,

---

unscheduled work day at Bernardi that ended with the defendant following Morales to the company parking lot, trying to climb into Morales's car, begging Morales not to send her back to jail, and promising Morales that she would pay her back. Additionally, a Bernardi manager related that while looking for information at the defendant's work station she found a business card bearing a number, expiration date, and security code that matched Morales's debit card information. The manager related that the defendant went "absolutely crazy" when she saw the manager with the papers and began grabbing them and trying to put them back inside the box from which the manager had retrieved them.

[6]Section 37A defines "[i]ssuer" as "the business organization or financial institution which issues a credit card or his duly authorized agent."

or anything else of value without immediate payment. Section 37B prohibits the misuse of "credit cards" by applicants, holders, and those who furnish goods or other things of value to the holder of such a card, and § 37C prohibits the fraudulent use of such cards to obtain money, goods, or services or anything else of value. Overarching the statutory framework is the definition of "[c]redit card" in § 37A as "any instrument or device, whether known as a credit card, credit plate, *or by any other name*, issued with or without fee by an issuer for the use of the cardholder in obtaining money, goods, services or anything else of value *on credit*." (emphasis supplied).

We agree with the Commonwealth that for purposes of G. L. c. 266, §§ 37A-37C, a debit card is the functional equivalent of a credit card.[7] See generally *Cumis Ins. Soc., Inc.* v. *BJ's Wholesale Club, Inc.* 455 Mass. 458, 462-463 (2009) (treating debit card as equivalent of credit card in context of scheme involving theft of card data). A debit card, like its credit card counterpart, is an "instrument or device . . . issued with or without fee by an issuer" (here Middlesex Savings Bank) "for the use of the cardholder" (here Morales) "in obtaining money, goods, services or anything else of value on credit." G. L. c. 266, § 37A. The defendant's argument that a debit card does not involve the obtaining of things of value "on credit" focuses too narrowly on only one facet of a debit card transaction, that between the issuer and the cardholder. See *ibid.*

We acknowledge that unlike a credit card transaction, in which a cardholder borrows funds from an issuer for a grace period or longer, a debit card transaction involves no similar extension of credit from the issuer to the cardholder because the cardholder's own funds, not those of the issuer, are drawn upon when the transaction is later posted and money is credited to the merchant. Nevertheless, a debit card transaction does involve an extension of credit at the point of sale and at least until the funds are later deducted from the cardholder's account by the issuer

---

[7]We acknowledge that from the vantage of the financial institutions and business organizations that issue and service such cards there are substantial differences between a debit card and a credit card. However significant those differences as a matter of commercial law, we view the differences as insignificant for purposes of the conduct proscribed by §§ 37A-37C.

and credited to the merchant's account (through acquiring bank intermediaries). See *Cumis Ins. Soc., Inc.* v. *BJ's Wholesale Club, Inc., supra* at 462-463 ("After the transaction is approved, the acquiring bank acquires the merchant's Visa or MasterCard receipt, pays the merchant for the amount of the transaction, and seeks payment from the issuing bank; the issuing bank pays the acquiring bank and debits the cardholder's account"). See also Black's Law Dictionary 424 (9th ed. 2009) (distinguishing between "consumer credit," which is "[c]redit extended to an individual to facilitate the purchase of consumer goods and services," and "bank credit," which is "[c]redit that a bank makes available to a borrower"). Although a debit card transaction does not involve the continued extension of credit after the settling of accounts that arises in a credit card transaction, a debit card transaction is nevertheless "on credit" for purposes of the statutory proscription against fraudulent use.

Indeed, debit cards and credit cards are virtually indistinguishable. The same plastic card often functions as *both* a debit card and a credit card, and whether the card is to be used as a debit card (drawing on the cardholder's own funds) or as credit card (obtaining a loan of funds for a grace period or longer) depends entirely on the option chosen by the cardholder at the point of sale.[8] The defendant's proposed construction of the statute would render a misuse or fraudulent use of a card dependent on the fortuity that the wrongdoer chose "credit" rather than "debit" at the point of sale. We cannot imagine that the Legislature intended such an absurd result. See *Commonwealth* v. *Roucoulet,* 413 Mass. at 652 (disapproving of proposed interpretation that would create loophole in criminal law unlikely to be endorsed by Legislature); *Commonwealth* v. *Tata,* 28 Mass. App. Ct. 23, 25-26 (1989); *Commonwealth* v. *Kneram,* 63 Mass. App. Ct. at 377.

Given the breadth of the statutory definition of a "credit card" as encompassing any instrument or device "by any . . . name" issued for the procuring of goods "on credit," the functional and practical equivalence of credit cards and debit cards, and the mischief sought to be made unlawful, we conclude that

---

[8]Although the record is unequivocal that a two-day delay occurred prior to the posting of sales against Morales's account, it is silent as to whether Morales's debit card possessed such dual characteristics.

a debit card fits within the ambit of a "credit card" as defined for purposes of G. L. c. 266, § 37C. See *Commonwealth* v. *Williams*, 427 Mass. 59, 62 (1998) ("If the language of the statute is fairly susceptible of a construction that would lead to a logical and sensible result we will construe it *so as to make it an* effectual piece of legislation in harmony with common sense and sound reason" [internal quotations and alterations omitted]). We do not perceive any ambiguity in the conduct proscribed such that an ordinary person would mistakenly understand the prohibited conduct to be unlawful if committed with a credit card but lawful if done with a debit card. See *Commonwealth* v. *Roucoulet, supra* at 652-653 (rule of lenity does not apply and "maxim that penal statutes are to be strictly construed does not mean that an available and sensible interpretation is to be rejected in favor of a fanciful or perverse one" that "create[s] great practical difficulty in the enforcement of the law").

3. *Common and notorious thief.* General Laws c. 266, § 40, provides in pertinent part that:

> "Whoever, having been convicted upon indictment, of larceny . . . afterwards commits a larceny . . . and is convicted thereof upon indictment, and whoever is convicted at the same sitting of the court . . . of three distinct larcenies, shall be adjudged a common and notorious thief, and shall be punished . . . ."

The defendant contends that the judge erred by interpreting the statute to permit the defendant's adjudication as a common and notorious thief because, although the defendant had been previously convicted of larceny upon an indictment and was again convicted of larceny upon an indictment as a result of the instant offense, she was not *also* convicted of three distinct larcenies at the same sitting of the court. We discern no such requirement in G. L. c. 266, § 40.

The defendant's proposed construction ignores the clear statutory language that permits conviction as a common and notorious thief in two different instances. The first, which applies here, arises when one who has been convicted *upon an indictment* for larceny is later charged and convicted *upon an indictment* of another larceny. The second arises when, whether upon

indictment or upon a complaint, one is tried and convicted of three separate larcenies at the same sitting of the court. See *Commonwealth* v. *Mills,* 436 Mass. 387, 388 (2002).

4. *Specific unanimity.* The judge did not err in refusing to provide a specific unanimity instruction. The Commonwealth proceeded on a theory that the defendant used Morales's debit card as a continuing course of conduct comprising a single criminal episode that, in aggregate, amounted to larceny and fraudulent use of a credit card in excess of $250. A specific unanimity instruction is called for "when, on a single charged offense, the prosecutor presents evidence of separate, discrete incidents, any one of which would suffice by itself to make out the crime charged." *Commonwealth* v. *Santos,* 440 Mass. 281, 284-285 (2003). Here, there was no danger of the juror confusion that underlies a specific unanimity instruction because none of the individual instances of theft other than that from Chadwick's exceeded the statutory minimum of $250. See *id.* at 285 ("[I]f the offense is alleged to have been committed as part of a single episode, there is no . . . risk of juror confusion and no specific unanimity instruction need be given").

Moreover, a specific unanimity instruction is not required where there is but a single larceny comprised of "successive takings . . . actuated by a single, continuing, criminal impulse or intent . . . pursuant to the execution of a general larcenous scheme." *Commonwealth* v. *England,* 350 Mass. 83, 86 (1966). Such was the case here, where the defendant's repeated, unauthorized use of Morales's debit card was part of a continuing criminal episode over a relatively short time period. See *Commonwealth* v. *Santos, supra* at 285-286 (rule applies where prosecution presents evidence of single criminal scheme or plan carried out consistently over time); *Commonwealth* v. *Lewis,* 48 Mass. App. Ct. 343, 350 (1999).

5. *Jury instruction.* The defendant concedes that the instruction on credit card fraud adequately apprised the jury of the requisite elements, including the requirement that the Commonwealth prove that the defendant's use was without the consent of Morales and with the intent to defraud her. Having provided a correct statement of the applicable law, the judge was not required to elaborate further between express consent and implied consent in the words sought by the defendant. See

*Commonwealth* v. *Martinez*, 437 Mass. 84, 92 (2002) (judge need not give particular instruction requested or use particular term); *Commonwealth* v. *Cruz*, 445 Mass. 589, 597 (2005) (where charge adequately covers issue, judge not required to instruct in particular language requested by defendant); *Commonwealth* v. *DeJesus*, 71 Mass. App. Ct. 799, 808 (2008). The defendant was free to argue, as she did, that Morales gave permission to use the card expressly or implicitly by her actions. That the jury rejected this view does not render the instruction erroneous.

6. *Admission of evidence of the defendant's incarceration and termination of employment.* The defendant's status as a work-release inmate was inextricably intertwined with the facts of the case and essential to the jury's understanding of the entire picture, including the defendant's motive, intent, and ability to gain Morales's sympathy to carry out her scheme. See *Commonwealth* v. *Butler*, 445 Mass. 568, 574-575 (2005). The judge appropriately instructed the jury as to the limited use of this testimony. See *Commonwealth* v. *Ferguson*, 425 Mass. 349, 356 (1997).

The judge did not abuse his discretion in admitting testimony from Joel Richards, the general manager of Bernardi, and others regarding the defendant's differing explanations for her use of Morales's credit card as evidence of consciousness of guilt. To the extent that it was error to permit one of the witnesses to disclose that the defendant was terminated because she used Morales's credit card, nothing in the admission of this testimony is so prejudicial as to warrant reversal of the defendant's convictions.[9] The evidence of the defendant's guilt was overwhelming, and in the context of the entire case we are satisfied that admission of this testimony did not influence the jury or had but slight effect. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). The defendant's convictions are affirmed except for the sentence for larceny over $250, which is vacated and subsumed within the judgment as a common and notorious thief.

*So ordered.*

---

[9]The defendant lodged no objection when Richards testified that he told her that her employment was being terminated. Objection was only lodged when Diane Ring testified that the defendant "was being let go for using [Morales's] credit card."