NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-886                                          Appeals Court


COMMONWEALTH  vs.  BRENISHA THOMPSON.


No. 14-P-886.

Middlesex.      March 24, 2016. - June 3, 2016.

Present:  Katzmann, Rubin, & Wolohojian, JJ.


Fraud.  False Impersonation & Identity Fraud.  Receiving Stolen
    Goods.  Evidence, Fraud.  Constitutional Law, Police power,
    Assistance of counsel, Harmless error.  Due Process of Law,
    Jurisdiction over nonresident, Assistance of counsel.
    Jurisdiction, Nonresident.  Error, Harmless.  Practice,
    Criminal, Duplicative convictions, Lesser included offense,
    Assistance of counsel, Harmless error.



    Indictments found and returned in the Superior Court
Department on January 26, 2012.

    The cases were tried before Sandra L. Hamlin, J.


    Patricia E. Muse for the defendant.
    Melissa Weisgold Johnsen, Assistant District Attorney
(Charles A. Koech, Assistant District Attorney, with her) for
the Commonwealth.


    KATZMANN, J.  The defendant was convicted by a Superior

Court jury of two counts of credit card fraud over $250 in

violation of G. L. c. 266, § 37C(e); two counts of credit card

fraud under $250 in violation of G. L. c. 266, § 37B(g); two counts of identity fraud in violation of G. L. c. 266, § 37E(b); one count of receiving stolen property with a value in excess of $250 in violation of G. L. c. 266, § 60; and one count of attempted credit card fraud in violation of G. L. c. 274, § 6. The defendant now appeals. She challenges the sufficiency of the evidence underlying the identity fraud convictions and the credit card fraud convictions relating to one of the victims.

We conclude that the defendant's identity fraud convictions are duplicative of her credit card fraud convictions, and that her conviction of receiving a stolen purse is legally inconsistent with her conviction of obtaining that purse through fraudulent use of a credit card. Accordingly, we reverse and vacate the defendant's convictions of identity fraud and receiving stolen property. We conclude that jurisdiction on the credit card fraud charges was properly laid in Massachusetts. Although it was error to admit the contested portions of a voicemail message the defendant left for the investigating detective in which she indicates that she would not talk with him unless an attorney was present and that she was asserting her right not to speak, we conclude that the error was harmless beyond a reasonable doubt, and that the error does not require reversal of the remaining convictions in the context of the trial as a whole. We thus affirm the credit card convictions.

Background.  In March of 2011, Ranwa Raad of Boxborough received a telephone call from Deckers.com, a seller of shoes, inquiring about a $476 charge made to her credit card on March 22, 2011.  Raad promptly contacted her credit card company to report this as an unauthorized charge.  As a result, the credit card was canceled.  On the same day of the Deckers.com charge, Raad's card was also used for a $326 charge on Coach.com, which markets purses.  Raad had not made this purchase either.

On March 29, 2011, Raad went to her local police station to report the unauthorized activity on her credit card.  She met with Detective Benjamin Levine, who began an investigation. Levine obtained transaction detail records for the Coach.com charge and determined that while the charge was billed to Raad at her home address in Boxborough, the electronic mail (e-mail) address associated with the order was "Brenisha@yahoo.com" and the purchased item (a purse) was shipped via Federal Express (FedEx) delivery service to "Bre Thompdon" at 145 Eastern Avenue, apartment 203, in Manchester, New Hampshire.

Around the same time in March, 2011, Pat Luoto of Hudson received a credit card statement with numerous charges from February and March that she had not made or authorized, including charges to Comcast, a digital cable television and Internet service provider; New Hampshire Turnpike EZ Pass (EZ Pass); Red Oak Property Management in Manchester, New Hampshire;

and Backcountry.com, which markets winter apparel. Luoto had never used Comcast, did not have an EZ Pass registered in New Hampshire, did not know what Red Oak Property Management was, and did not frequent Backcountry.com. Luoto called her credit card company to report the problem. In addition, there were charges on her card for hotels in New York City, a restaurant in Rye, New York, a prepaid wireless telephone company, and Mycleanpc.com that Luoto had not made or authorized. Luoto's credit card was canceled as a result of the fraud.

After meeting with Raad, Levine contacted Detective Jean Roers of the Manchester, New Hampshire, police department and asked her to visit 145 Eastern Avenue, apartment 203, in Manchester to see if she could ascertain the status of the FedEx delivery from Coach.com.

When Roers knocked on the door at the Eastern Avenue apartment on March 29, 2011, it was the defendant, Brenisha Thompson, who answered. The defendant acknowledged that she had received a Coach brand purse in a FedEx package. She said that she had not been expecting the purse, but that she thought it was sent to her by her former boy friend, Vincent Rennie. The defendant added that Rennie had previously asked her if she was willing to make some extra money on the side by receiving packages of clothing, shoes, and purses in the mail and repackaging and shipping the merchandise elsewhere or

transferring the goods to others in person.  She stated, however, that Rennie was living in New York or New Jersey and that, other than one e-mail message, they had not been in contact since a fight at Christmas.

Roers told the defendant that the purse was evidence and would have to be turned over to the police in Boxborough.  The defendant complied, first emptying the purse of her wallet, keys, makeup, and other personal belongings before handing it over to Roers.

Detective Levine initially suspected that the unauthorized charges on Raad's credit card related to a larger international scheme in which unassuming people are recruited on a classified advertisement Web site such as Craigslist or social networking sites to receive shipments of fraudulently obtained goods and repackage and reship them, typically out of the country.  As a result, he obtained shipping records from both United Parcel Service (UPS) and FedEx for the defendant's address.  These records revealed only one additional delivery to the defendant's Manchester apartment, a UPS delivery from Backcountry.com.

Levine was later able to determine that the Backcountry.com delivery was a woman's North Face brand fleece jacket that had been ordered for $88.70 using Luoto's credit card on March 6, 2011.  The billing address on the order was Luoto's Hudson address.  The e-mail address associated with the order, however,

was once again "Brenisha@yahoo.com."  The online order for the fleece jacket was placed from an "IP address" registered to Comcast in Manchester, New Hampshire.  Levine reached out to Luoto and ultimately discovered the additional unauthorized charges to Luoto's credit card recited above.

Levine's investigation also revealed that the apartment on Eastern Avenue was rented in the name of "Bre Thompson" through Red Oak Property Management, though the rent was sometimes paid by the defendant and sometimes by Rennie.  Levine further obtained audio recordings of calls to a wireless telephone company in which an individual identifies himself as Vincent Rennie and uses Luoto's credit card information to add minutes to a prepaid wireless account while claiming that Luoto's credit card belonged to the defendant.  The New York City hotel charges on Luoto's card were linked to an e-mail address ostensibly maintained by Rennie, "VRennie51@gmail.com."

Neither Raad nor Luoto had ever met the defendant, authorized her to use their credit cards, or used the e-mail account "Brenisha@yahoo.com."  Luoto further testified that she did not know Vincent Rennie.

As part of Levine's investigation, he sought to meet with the defendant to discuss the case.  On April 6, 2011, the defendant called Levine and left him the following voicemail message:

"Hi, Detective [Levine].  This is Brenisha Thompson.  I was calling to leave you a message to say that I would not be able to make it down today for [indiscernible] my mom's house down in [Hampden] this past weekend looks good, so I just wanted to see her and my family and I was planning on going down there next weekend to see her, but I'm going to go down there [indiscernible] and actually to go and see her.

"I feel that if I did go down there without legal representation, I just wanted to have you know an attorney there I want to be very cooperative with you and I just wanted to assert my right to not to say anything and you know if they're going to proceed with this [investigation] I guess, you know, where are we going to go from there.  I mean I think I know [Vincent] did not do this.  I know [who did it], but you know I can't prove that this person he did it because he's been [wrecking] my life for the past few years and he has [indiscernible].  It's something that I've been dealing with between you and I all these [indiscernible].

"I will contact you back.  You have my number.  Okay.  Sorry.  Have a nice day."

Following indictment, the defendant was tried and convicted by a Superior Court jury on the charges identified above.  She now appeals.

Discussion.  We first consider the defendant's challenges to the identity fraud convictions and the question whether they are duplicative of the credit card convictions, the jurisdictional viability of her receiving stolen property and credit card convictions, and the sufficiency of the evidence with respect to the convictions in connection with the use of Luoto's credit card.  Finally, we address the defendant's claim

of reversible error in the admission of her April 6 voicemail message.

1. Identity fraud convictions. The defendant challenges the sufficiency of the evidence underlying her identity fraud convictions, contending, in part, that if the Commonwealth could rely on the same proof concerning use of the victims' credit cards to support both the credit card fraud convictions and identity fraud convictions, then identity fraud would effectively be a lesser included offense of credit card fraud. While we do not accept the argument in the form presented by the defendant, we conclude, based on the elements of the offenses of credit card fraud and identity fraud pursued by the Commonwealth here, that identity fraud is a lesser included offense.[1]

"[A] lesser included offense is one which is necessarily accomplished on commission of the greater crime." Commonwealth

---

[1] "When statutory crimes can be violated in multiple ways, comparison of their elements must focus on the specific variations that the defendant is alleged to have committed. For example, if a greater offense contains two independent theories of liability, it is sufficient that a lesser offense be subsumed within the particular theory that was alleged." Commonwealth v. Roderiques, 462 Mass. 415, 421 (2012). Here, the Commonwealth alleged that the defendant violated G. L. c. 266, § 37C(e), as amended by St. 1987, c. 468, § 3, "by representing without the consent of the cardholder that [s]he is said cardholder" as opposed to "by representing that [s]he is the holder of a card and such card has not in fact been issued." Accordingly, we focus on that specific variation of credit card fraud, as well as the specific variation of identity fraud charged by the Commonwealth, in conducting the elements-based test infra.

v. Porro, 458 Mass. 526, 531 (2010), quoting from Commonwealth v. D'Amour, 428 Mass. 725, 748 (1999). When comparing the two crimes, we consider the elements of the crimes rather than the facts of any particular case. See Commonwealth v. Vick, 454 Mass. 418, 431 (2009). "A crime is a lesser-included offense of another crime if each of its elements is also an element of the other crime." Commonwealth v. Roderiques, 462 Mass. 415, 421 (2012) (quotation omitted). With these principles in mind, we turn to the elements of the two crimes at issue here.

The parties have not alerted us to any authority that has distilled the elements of credit card fraud, and we are not aware of any. Cf. Commonwealth v. Pearson, 77 Mass. App. Ct. 95, 98 n.9 (2010) (noting that "neither the Superior Court nor the District Court has a model instruction for violations of [G. L. c. 266,] § 37B or § 37C"). Under the provision of G. L. c. 266, § 37C(e), relevant here, "[w]hoever, with intent to defraud . . . obtains money, goods or services or anything else of value by representing without the consent of the cardholder that he is said cardholder . . . , where the value of money, goods or services obtained in violation of this section is in excess of two hundred and fifty dollars . . . shall be punished . . . ." The statute further defines the term "cardholder" as "the person named on the face of a credit card to whom or for

whose benefit the credit card is issued by an issuer." G. L. c. 266, § 37A, as amended by St. 1969, c. 832.

We therefore discern that conviction under this variation of credit card fraud requires proof beyond a reasonable doubt that the defendant (1) represented himself as the person named on a credit card; (2) did so without the consent of the person named on the card; (3) by doing so obtained money, goods, or services or anything else of value in excess of $250; and (4) did so with the intent to defraud.[2] Aside from relaxing the requirement that the thing obtained have a value in excess of $250, we do not see that the fraudulent use of a credit card under $250 penalized by G. L. c. 266, § 37B($\underline{g}$), comprises different basic elements.

In terms of the variation of identity fraud at issue here, a conviction under G. L. c. 266, § 37E($\underline{b}$), "requires that the

---

[2] The elements we identify here generally track those recited by the judge in her final charge: (1) that the defendant falsely represented herself, directly or indirectly, as another person; (2) that she did so without that person's consent; (3) that she made such a representation to obtain money, goods, services or anything of value; and (4) that she did so with the intent to defraud. Although the judge's recitation of the elements does not include the term "cardholder," the judge had previously recited portions of some of the indictments that use the "cardholder" language, repeatedly referred to the charge as fraudulent use of a credit card, and, immediately before breaking down the elements, specified that the statute at issue "prohibits anyone from intending to defraud, by obtaining money, goods, services or anything of value, by representing, without the consent of the cardholder, that she is the cardholder" (emphasis added).

Commonwealth prove beyond a reasonable doubt four elements, specifically, that a defendant (1) posed as another person; (2) did so without that person's express authorization; (3) used the other person's identifying information to obtain, or attempt to obtain, something of value; and (4) did so with the intent to defraud."  Commonwealth v. Giavazzi, 60 Mass. App. Ct. 374, 376 (2004) (footnote omitted).  See Commonwealth v. Catalano, 74 Mass. App. Ct. 580, 582 (2009).  The statute explains that to "pose" means "to falsely represent oneself, directly or indirectly, as another person or persons" and that "personal identifying information" means "any name or number that may be used, alone or in conjunction with any other information, to assume the identity of an individual, including," inter alia, "any name" and a "credit card number."  G. L. c. 266, § 37E(a), inserted by St. 1998, c. 397, § 1.  Thus, we might restate the first element of identity fraud to read that a defendant (1) falsely represented himself, directly or indirectly, as another person.

In comparing the elements of the two offenses, it is immediately apparent that they share an identical fourth element in the requirement of an intent to defraud.  There is also overlap between the first elements of the two offenses because it is implicit in credit card fraud's lack of consent requirement (the second element) that the person representing

himself as the cardholder in the first element is <u>falsely</u> representing himself, whether directly or indirectly, as another person, namely the cardholder.[3]  The second element of credit card fraud requires that the defendant make this representation without the cardholder's consent.  Identity fraud's second element requires that the defendant represent himself as another person without the other person's express authorization.  We do not see a meaningful difference between the use of "consent" and "authorization" in this context and so note that anything accomplished without consent is necessarily also done without express authorization.[4]  Finally, with respect to their third elements, when, by using the name on a credit card, someone obtains money, goods, or services or anything else of value, whether it be in excess of $250 or less than $250, that person has necessarily obtained or attempted to obtain something of

---

[3] In expounding on the elements of identity fraud, the Supreme Judicial Court recently highlighted this overlap:  "A false representation may be made . . . indirectly, e.g., through an electronic program where a person enters the credit card number of another attempting to act as the owner of that card." <u>Commonwealth</u> v. <u>Mattier (No. 2)</u>, 474 Mass. 261, 267 n.9 (2016).

[4] We understand the Legislature's unqualified use of "consent" in the credit card fraud statute to encompass both implicit and express consent.  Cf. <u>Commonwealth</u> v. <u>Ryan</u>, 79 Mass. App. Ct. 179, 187-188 (2011).  Thus, a lack of "consent" under this statute implies lack of both implicit and express consent and, consequently, lack of express authorization.

value by using personal identifying information, which includes names and credit card numbers.

In sum, the variation of identity fraud under G. L. c. 266, § 37E(b), of which the defendant was convicted here "is necessarily accomplished on commission of the greater crime[s]" of the variations of credit card fraud under G. L. c. 266, §§ 37C(e) and 37B(g), of which the defendant was convicted, and so it is a lesser included offense. Porro, 458 Mass. at 531. While there are many ways to commit identity fraud without committing credit card fraud, there are no ways to commit the credit card fraud charged here without committing the identity fraud charged here.[5] Because its third element encompasses attempts to obtain anything of value, identity fraud is also a lesser included offense of the attempted credit card fraud of which the defendant was convicted as the Commonwealth's theory is that the defendant "fail[ed] in perpetration" or was "prevented in . . . perpetration," G. L. c. 274, § 6, of credit card fraud with respect to the Deckers.com order (by which she

---

[5] It matters not that there are multiple ways of posing and using personal identifying information that would satisfy the elements of identity fraud and yet which do not involve the use of a credit card. "[W]hen a lesser offense contains an element that can be satisfied in multiple ways, and the purportedly greater offense can be satisfied in only one of those ways, the former is still included within the latter. Any person who violates the greater offense will still always violate the lesser offense." Roderiques, 462 Mass. at 421.

attempted to purchase three pairs of Ugg brand shoes and boots) only to the extent that she did not actually obtain the things of value that she sought.

Because we have concluded that identity fraud is a lesser included offense of the defendant's convictions of credit card fraud (both over $250 and under $250) and attempted credit card fraud, it is apparent that the defendant stands convicted of cognate offenses, raising the specter of duplicative convictions and attendant double jeopardy concerns. See Porro, 458 Mass. at 531 ("[D]ouble jeopardy prohibits a defendant from being convicted and, therefore, sentenced, for both the greater and lesser offense as a result of the same act").[6] Where a defendant is charged with both greater and lesser included offenses and "the judge does not clearly instruct the jury that they must find that the defendant committed separate and distinct criminal acts to convict on the different charges, the conviction of the lesser included offense must be vacated as duplicative, even in the absence of an objection, if there is any significant possibility that the jury may have based convictions of greater

---

[6] We note that because the issue whether identity fraud is a lesser included offense of credit card fraud was not raised at trial, neither the judge nor the jury were asked to consider whether the offenses rested on separate and distinct acts or the prospect of duplicative convictions.

and lesser included offenses on the same act or series of acts." Commonwealth v. Kelly, 470 Mass. 682, 700 (2015).

Not surprisingly, given that the issue whether identity fraud is a lesser included offense of credit card fraud was not raised at trial, the record does not reflect that a separate and distinct acts instruction was given. "That the judge instructed the jury several times that they must consider each indictment separately did not equate to informing the jury that the [greater and lesser included] offenses must be factually based on separate and distinct acts." Id. at 701.

Moreover, it is apparent from the record that all of the Commonwealth's evidence relating to identity fraud concerned actions the defendant took in furtherance of her various fraudulent credit card transactions and her attempted credit card fraud. Contrast id. at 702 ("[E]ven where, as here, there was evidence of separate and distinct acts sufficient to convict with respect to each assault and battery charge, the judge's failure to instruct the jury that each charge must be based on a separate and distinct act created a substantial risk of a miscarriage of justice"). We therefore conclude that the identity fraud convictions must be vacated as duplicative, and the indictments dismissed.

2. Receiving stolen property. The defendant was also convicted of receiving stolen property for her possession of the

Coach purse retrieved by Detective Roers from the defendant's Manchester apartment in violation of G. L. c. 266, § 60.[7] The indictment for this offense alleges that the offense occurred "at Boxborough, in the County of Middlesex." We, however, are dubious of the jurisdictional basis for prosecuting this crime in the Commonwealth. Although not initially raised by either party, jurisdictional questions "may be raised at any time in the progress of a case, including at the appellate level, and, indeed, it is the duty of an appellate court, if it becomes aware of a jurisdictional point, to raise it on its own motion." Commonwealth v. Zawatsky, 41 Mass. App. Ct. 392, 394 (1996). See Commonwealth v. Andler, 247 Mass. 580, 581-582 (1924).[8]

"The general rule, accepted as 'axiomatic' by the courts in this country, is that a State may not prosecute an individual for a crime committed outside its boundaries." Vasquez, petitioner, 428 Mass. 842, 848 (1999). Our jurisdictional

---

[7] General Laws c. 266, § 60, as amended by St. 1987, c. 468, § 4, provides, in pertinent part: "Whoever . . . receives or aids in the concealment of stolen or embezzled property, knowing it to have been stolen or embezzled, . . . shall, . . . if the value of such property exceeds two hundred and fifty dollars, be punished . . . ." The statute was amended in 2014, effective April 6, 2015 (St. 2014, c. 451, § 3); the amendment has no bearing on this case.

[8] After initial argument of this appeal, we ordered supplemental briefing on the questions of jurisdiction for the receiving stolen property and credit card offenses. We also ordered supplemental briefing on the question whether identity fraud is a lesser included offense of credit card fraud.

doubts are reinforced by long-standing precedent indicating that Massachusetts lacks jurisdiction in cases of this kind where the defendant is found in possession of stolen goods outside the territorial boundaries of our Commonwealth even where the goods in question were first stolen in the Commonwealth.  See Commonwealth v. Phelps, 192 Mass. 591, 593-594 (1906) ("Although possession out of the Commonwealth of goods stolen in the Commonwealth would not of itself warrant a conviction for receiving them and aiding in their concealment here, evidence of such possession would be competent against one accused of that offence"); Commonwealth v. Obshatkin, 2 Mass. App. Ct. 1, 3 (1974).

In Phelps, the defendant had admitted to receiving the goods in question in Williamstown.  The defendant, however, claimed that he did not learn that the goods were stolen until the goods had been shipped out of State.  In response to this argument, the court approved a jury instruction that would have led the jury to understand "that in order to convict they must find that the defendant had acquired a guilty knowledge or belief when the goods first came into his possession, which was in this State or while they were in his possession subsequently in this State."  Phelps, 192 Mass. at 594.  The clear implication is that the defendant must both possess the stolen

goods and know that they are stolen while he is in the Commonwealth in order to be convicted here.

Obshatkin also indicated that possession of the goods within Massachusetts was essential. Obshatkin was "not a case in which the crime, or part of the crime, was shown to have been initiated beyond the boundaries of the Commonwealth but, rather, a case in which certain links in the chain of circumstantial evidence tending to prove the commission of a crime within the Commonwealth were discovered elsewhere." Obshatkin, 2 Mass. App. Ct. at 4 (citations omitted). Those links tended to warrant an inference by the jury that "that the receipt did take place in Massachusetts." Id. at 3. No similar inference is available to the Commonwealth here.

It has been held that jurisdiction in the Commonwealth on charges of receiving stolen property is proper regardless of where the property was stolen so long as the defendant is in possession, or aids in the concealment, of this property in Massachusetts. See, e.g., Commonwealth v. White, 123 Mass. 430, 433 (1877); Commonwealth v. Carroll, 360 Mass. 580, 586 (1971). But we are aware of no case, and the parties have not directed us to any, that stands for the obverse proposition that one can be convicted of receiving stolen property for control of stolen goods outside the Commonwealth so long as the property was first stolen in the Commonwealth. In this case, there is the added

complication of determining whence, and from whom,[9] the item in question, a Coach bag ordered over the Internet and apparently shipped to New Hampshire from Florida, was "stolen."[10]

In considering the possibility that the underlying fraudulent use of the credit card used to effectively steal the bag serves as the basis for the proposition that the bag was stolen in or from Massachusetts, we are led to the conclusion that, in addition to an apparent lack of jurisdiction, the defendant's conviction of receiving stolen property must be vacated for a wholly separate reason. Where the defendant stands convicted both of credit card fraud and knowing receipt of the fruits of that fraud, the latter conviction must fall because of the "well-established" principle, "as has been the

---

[9] For example, the indictment alleges that the "leather bag" in question is "the property of Coach."

[10] The Commonwealth also invokes G. L. c. 277, § 58A, which provides that the crime of receiving stolen property defined under G. L. c. 266, § 28, as amended by St. 1971, c. 694, "may be prosecuted and punished in the same jurisdiction in which the larceny or embezzlement of any property involved in the crime may be prosecuted and punished." Even if we agree for the sake of argument that the Coach bag was stolen in Massachusetts, the statute invoked by the Commonwealth "deals only with venue, and does not confer jurisdiction." Commonwealth v. Armstrong, 73 Mass. App. Ct. 245, 253-254 (2008) (interpreting G. L. c. 265, § 24A, which "conveys dual venue for trial of a crime in which a victim is transported within Massachusetts from one county to another in order to commit the crime"). We interpret language in Commonwealth v. Parrotta, 316 Mass. 307, 310-311 (1944), citing G. L. c. 277, § 58A, and discussing "exten[sion of] the territorial jurisdiction of the court" to similarly refer only to venue.

law of the Commonwealth for more than a century, that a person cannot be convicted of both larceny and receipt of the same goods."  Commonwealth v. Corcoran, 69 Mass. App. Ct. 123, 125, 128 (2007).  See Commonwealth v. Nascimento, 421 Mass. 677, 683 (1996), citing Commonwealth v. Haskins, 128 Mass. 60, 61 (1880) ("It is well established that it is inconsistent in law for a defendant to be convicted both of stealing property and of receiving the same property").[11]

The defendant was found guilty on the indictment charging her with fraudulent use of a credit card in obtaining "a leather Coach bag."  Thus, although it may be challenging to state definitively from whom and where the bag was stolen, it is clear from the jury's verdict that, to the extent the bag was "stolen," the jury determined that it was stolen by the defendant.

Consequently, we vacate the receiving stolen property conviction and direct that the indictment be dismissed on the

---

[11] As the Nascimento court explained, in cases such as this, "[t]he jury should have been instructed that the defendant could not be convicted of receiving stolen property if they found that the defendant had stolen the same property. . . .  When the inconsistent verdicts were returned, the judge might have sent the jury back for further deliberations with explanatory instructions."  421 Mass. at 683.

basis of the legal inconsistency[12] between the credit card fraud conviction relating to the Coach purse and the receiving stolen property conviction relating to the same purse.  See Nascimento, 421 Mass. at 684-685; Corcoran, 69 Mass. App. Ct. at 125 n.2.

3.  Credit card fraud.  We are satisfied that jurisdiction on the credit card fraud charges is properly laid in Massachusetts.  Under well-established principles, a State has the power to make conduct or the result of conduct a crime if the conduct takes place or the result happens within its territorial jurisdiction.  That the defendant was in New Hampshire when she put into motion the credit card fraud by using the victims' credit cards without authorization does not deprive Massachusetts of jurisdiction where the defendant's actions (including inputting the Massachusetts addresses of the two victims as billing addresses) victimized two Massachusetts residents who were present in Massachusetts when the fraud was committed, and who were forced to account for unauthorized charges and to have their cards canceled in Massachusetts.

---

[12] Our cases have explained that "[t]he same facts cannot lead to the conviction of a single defendant for both crimes because a conviction of receipt of stolen goods requires that the property already be stolen at the time of receipt." Corcoran, 69 Mass. App. Ct. at 127 n.6.  Here, the credit card fraud -- and so the underlying theft -- was not complete until the defendant obtained goods of value in excess of $250 (the leather bag), which was the same point at which she received the stolen property.

Under its broad police powers, Massachusetts "has power to enact rules to regulate conduct, to the extent that such laws are necessary to secure the health, safety, good order, comfort, or general welfare of the community." Commonwealth v. Ora, 451 Mass. 125, 129 (2008) (quotation omitted).  It is beyond dispute that the credit card fraud statute -- by protecting Massachusetts residents from credit card fraud and punishing conduct that is violative of the safety and good order of Massachusetts and the interests of the Commonwealth in ensuring that those who are within its borders do not suffer from criminality -- is a proper exercise of that police power.  The prosecution by Massachusetts in redress of the two cardholder victims who resided in Massachusetts at the time of the defendant's fraud thus falls squarely within that power.

Quite apart from this victimization, jurisdiction is proper where the defendant violated her duty under G. L. c. 266, § 37C(e), to obtain consent from the cardholders to use their credit cards.  See Commonwealth v. Liotti, 49 Mass. App. Ct. 641, 642 n.2 (2000) ("A cardholder may consent to another person using his or her credit card").  Where each cardholder victim resided in Massachusetts at the time that her credit card was fraudulently used, we consider the victim's nonconsent as a "predicate act proving an offense element" that took place in Massachusetts for purposes of establishing a jurisdictional

basis for the defendant's convictions of credit card fraud and attempted credit card fraud.[13] Commonwealth v. Armstrong, 73 Mass. App. Ct. 245, 251 (2008). See Vasquez, petitioner, 428 Mass. at 850 (referring to "general criminal-law rule that a crime involving a failure to act is committed at the place where the act is required to be performed" [quotation omitted]); Cypher, Criminal Practice and Procedure § 2:18, at 56-57 (4th ed. 2014) ("Crimes of omission are ordinarily regarded as committed at the place where the required act should have been performed, and the courts at such places have jurisdiction of the offender even if he was not personally present at any time therein"); Model Penal Code § 1.03(1)(e), at 34 (1985) (State has jurisdiction where "the offense consists of the omission to perform a legal duty imposed by the law of this State with

---

[13] We further note that sound public policy reasons overlap with this exercise of jurisdiction in that we should not require victims to travel out-of-State to hold accountable those who have defrauded them, especially where, as we discuss further infra, there is nothing to suggest that they were victimized because of their own out-of-State conduct. Although the defendant here resided in a neighboring State (New Hampshire) at the time of her crimes, in the era of online credit card fraud, this same fact pattern might just as easily have involved a defendant living on the other side of the country. The victim's presence at the trials of these types of offenses is not a mere courtesy, but a virtual necessity for sufficient proof for conviction. Thus, in the context of the analogous lack of "express authorization" element of identity fraud, we have observed that "[o]rdinarily, absence of authorization will be shown by the testimony of the person whose identity has been used by another." Giavazzi, 60 Mass. App. Ct. at 377-378.

respect to domicile, residence or a relationship to a person, thing or transaction in the State").  See also State v. Roberts, 143 So. 3d 936, 936 (Fla. Dist. Ct. App. 2014).[14]

Nor is prosecution in Massachusetts barred by "[t]he general rule, accepted as 'axiomatic' by the courts in this country, . . . that a State may not prosecute an individual for a crime committed outside its boundaries." Vasquez, petitioner, 428 Mass. at 848.  "Despite this general rule, . . . a State is not deprived of jurisdiction over every criminal case in which the defendant was not physically present within the State's borders when the crime was committed." Ibid.  Our courts have recognized "a very limited exception allowing a State extraterritorial jurisdiction over a criminal offense:  the 'effects' doctrine." Commonwealth v. Armstrong, 73 Mass. App.

---

[14] In Roberts, 143 So. 3d at 936, the court concluded that Florida had jurisdiction over charges of fraudulent use of personal identification filed against an out-of-State defendant who used a Florida resident's name and Social Security number to establish a utility account in Indiana because the defendant's failure to obtain the victim's prior consent "was both an omission of a duty imposed by Florida law and an element of the underlying offense."  The court reasoned that where the underlying statute prohibited use of personal identification information without authorization or prior consent, the duty to the victim "is best characterized as an affirmative obligation to obtain her prior permission in order to use her personal information." Id. at 938.  Jurisdiction was therefore appropriate under a State statute providing that an offense based on an omission to perform a duty imposed by Florida law, which in this case was the "gravamen of the offense," is committed within Florida regardless of whether the offender is within or outside the State. Id. at 939.

Ct. at 249. "The 'effects' doctrine provides that '[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect." Vasquez, petitioner, 428 Mass. at 848-849, quoting from Strassheim v. Daily, 221 U.S. 280, 285 (1911) (footnote omitted).[15] In the case before us, we are satisfied that the effects of the credit card fraud were felt in the Commonwealth, especially where the conduct specifically victimized citizens of our Commonwealth while they were present in the Commonwealth. Contrast Armstrong, 73 Mass. App. Ct. at 252-253.

Our conclusion, based on the effects test of Strassheim and Vasquez, petitioner, is consistent with the decisions of other courts that have confronted similar questions. For example, in State v. Allen, 336 P.3d 1007, 1009 (N.M. Ct. App. 2014), the Court of Appeals of New Mexico was presented with the question whether the defendant could be prosecuted for identity theft in New Mexico "when he never set foot in New Mexico, and all the

---

[15] Insofar as the defendant appears to argue that the Massachusetts courts lacked personal jurisdiction over her, we note that a similar claim was rejected in Vasquez, petitioner, 428 Mass. at 846 ("The jurisprudence of personal jurisdiction has no bearing on the question whether a person may be brought to a State and tried there for crimes under that State's laws. . . . The petitioner's claim is more properly viewed as an argument [rejected by the court] that Oregon has no legislative jurisdiction to criminalize acts that occur outside the boundaries of the State").

acts of using Victim's identity occurred in other states." The Allen court relied on Strassheim to "conclude that if a crime has a detrimental effect in a state, that state has territorial jurisdiction to prosecute the perpetrator notwithstanding that the acts were committed entirely within another state." Id. at 1013. Where the victim "encountered issues trying to get a driver's license in New Mexico" and "was mailed rental car bills in New Mexico that were incurred by Defendant outside of New Mexico," the court was satisfied that the defendant's extraterritorial action had detrimental effects in New Mexico. Id. at 1014. Here, the detrimental effects in Massachusetts of the defendant's conduct, forcing the victims to account for unauthorized charges and cancel their credit cards, are of equally sufficient jurisdictional weight. Cf. G. L. c. 266, § 37E(d) (defining "financial loss sustained by a victim as a result" of identity fraud, for which convicted offenders "shall" be ordered to make restitution, to "include any costs incurred by such victim in correcting the credit history of such victim").

The Allen court's finding of jurisdiction was further supported by its construal of the identity theft venue provisions of N.M. Stat. Ann. § 30-16-24.1(G) (2009). That statute directs that the crime "shall be considered to have been committed in the county: (1) where the person whose identifying

information was appropriated . . . or . . . resided at the time of the offense; or (2) in which any part of the offense took place, regardless of whether the defendant was ever actually present in the county."  The court reasoned that this provision served the dual purpose of establishing venue and, notwithstanding the distinction between venue and jurisdiction, setting forth "a legislative determination that because the crime has an effect upon the victim in New Mexico, New Mexico has territorial jurisdiction over the offense, even if the acts are committed in another state."  Allen, 336 P.3d at 1014.[16]

We find a similar legislative determination in the Massachusetts Legislature's inclusion of subsection (f) of the identity fraud statute, which provides, "police incident reports [concerning identity fraud] may be filed in any county where a victim resides, or in any county where the owner or license holder of personal information stores or maintains said personal information, the owner's or license holder's principal place of business or any county in which the breach of security occurred, in whole or in part."  G. L. c. 266, § 37E(f), inserted by

---

[16] Like the crimes of identity fraud and credit card fraud charged here, one of the elements of identity theft in New Mexico is that the defendant acted "without authorization." Because of its conclusion based on Strassheim and the venue statute, the Allen court determined that it was not necessary "to determine whether the 'without authorization' of the crime must occur where the victim resides."  Allen, 336 P.3d at 1010.

St. 2007, c. 82, § 18. In empowering and directing local police departments to pursue identity fraud investigations, the statute reflects the Legislature's intent to protect victims of identity fraud who reside in Massachusetts. This legislative intent should apply equally to credit card fraud victims where, as we have already discussed, a violation of G. L. c. 266, § 37C(e), automatically includes an identity fraud violation. It is only logical, if not inevitable, that the prosecution of the offense will proceed, as it did here, in the jurisdiction where the crime is reported to police and investigated. It would be absurd to allow victims to effectively commence prosecution of identity fraud where they reside but require them to report and prosecute credit card fraud predicated on the same conduct in another jurisdiction.

The kind of jurisdictional issue we confront in this case is likely to appear with increasing frequency as criminals exploit our digital and virtual interconnectedness to prey on victims at a geographic remove. We do not suggest that our analysis will govern all factual variations. But the potential for complex factual variation need not detain us here. Because the defendant failed to challenge the court's jurisdiction below, "the issue of territorial jurisdiction was not a live one at trial," Commonwealth v. Jaynes, 55 Mass. App. Ct. 301, 308 (2002), and any factual nuances that might bear on jurisdiction

were not explored. Although, as noted, we raised sua sponte the question of jurisdiction and received supplemental briefing, we are satisfied that there was jurisdiction (even if not exclusive jurisdiction) in Massachusetts[17] where the undisputed evidence and inferences to be drawn therefrom support the conclusion that the victims resided in Massachusetts at all relevant times and felt the effects of the fraud in Massachusetts. See LaFave, Substantive Criminal Law § 4.4(c)(1), at 308 (2d ed. 2003) (discussing Strassheim's "effects doctrine" and noting that "[o]n the other hand, a state probably has no power to protect its own citizens from conduct by non-citizens taking place in other states and resulting in harm there").[18]

---

[17] Even prior to the Model Penal Code's rejection of "the old common law doctrines of strict territoriality and of assigning exclusive jurisdiction to the state where the last element occurred," Model Penal Code § 1.03 Explanatory Note, at 35, courts in Massachusetts recognized the validity of concurrent criminal jurisdiction in at least some cases, such as larceny and homicide. For example, Commonwealth v. White, 358 Mass. 488, 492 n.7 (1970), quotes Justice Sedgwick's summary disposal of the argument against overlapping jurisdiction in Commonwealth v. Andrews, 2 Mass. 14, 22 (1806): "It is, however, said that although . . . [one defendant] might be punished in this state, he may still be punished in New Hampshire. And wherefore should he not? For myself I feel no such tenderness for thieves, as to desire that they should not be punished wherever guilty. If they offend against the laws of two states, I am willing they should be punished in both."

[18] Our cases establish that where there is at least "a 'reasonable and possible inference'" that the offense was committed outside the confines of Massachusetts, Commonwealth v. Adelson, 40 Mass. App. Ct. 585, 590 (1996), the question

4. <u>Sufficiency of evidence of use of Luoto's credit card</u>. The defendant contends that the Commonwealth failed to adduce sufficient evidence of her use of Luoto's credit card to sustain her credit card fraud convictions with respect to that victim. For the reasons discussed below with respect specifically to charges to pay her landlord (Red Oak Property Management) and her EZ Pass fees as well as the purchase of the North Face jacket from Backcountry.com, we are satisfied that, viewed in the light most favorable to the Commonwealth, <u>Commonwealth</u> v. <u>Latimore</u>, 378 Mass. 671, 676-677 (1979), there was sufficient circumstantial evidence to convict the defendant. The jury could have inferred that, with the intent to defraud and without Luoto's consent, the defendant represented that she was the person named on Luoto's credit card in order to consummate each of these transactions and, thereby, obtain goods and services in violation of G. L. c. 266, § 37C(<u>e</u>).

---

"[w]hether a criminal act occurred within the territorial boundaries of the Commonwealth, and thus whether the Commonwealth has jurisdiction over the individual charged with that act, is a question of fact to be settled by proof. As such, it is an issue entrusted to the deliberative process of the jury." <u>Commonwealth</u> v. <u>Travis</u>, 408 Mass. 1, 8 (1990) (quotation omitted).

However, "[w]here none of the relevant facts as developed during the trial [gives] rise to a reasonable and possible inference [that the relevant conduct took place] outside the confines of Massachusetts . . . the issue [is] properly within the province of the judge, as matter of law." <u>Commonwealth</u> v. <u>Jaynes</u>, 55 Mass. App. Ct. at 309 (quotation omitted).

5.  <u>The unredacted voicemail message and the rights to counsel and silence</u>.  At the end of the direct examination of Levine, the Commonwealth introduced a tape recording of a telephone message left by the defendant for Levine.  The admissibility of the voicemail message was discussed at multiple points in the proceedings.  The Commonwealth sought to admit the recording because its content conflicted with the defendant's statement to Roers in which she blamed Rennie, enabling the Commonwealth to argue that the "shift in stories" showed consciousness of guilt.  The Commonwealth contended that the communication showed that the defendant was evasive and "waffled" in her communication with the detective and provided the jury with an opportunity to assess from her tone of voice whether she was forthcoming.  The defendant objected, noting, inter alia, that the recording refers to the defendant's having made and broken a number of appointments to see Detective Levine, and that the defendant states that she does not want to speak to the police without an attorney.  Defense counsel argued that the jury would draw an adverse inference against the defendant based on her reluctance to meet with the police and her desire for a lawyer.

The judge initially asked the Commonwealth if the voicemail message could be played without the reference to the defendant's wanting to talk to a lawyer.  Although the Commonwealth had

initially expressed doubts about how quickly that could be done, the prosecutor was confident it could be done by the following morning and was to look into the technological feasibility of redacting during a recess while the judge researched the underlying legal issues.  However, when the judge resumed the bench twenty minutes later, she decided to play the voicemail recording without redaction and give a limiting instruction.

On appeal, the defendant contends that admitting the portion of her voicemail recording where she indicated that she did not want to speak with the police without an attorney and that she was asserting her "right to not to say anything" violated her right to counsel and due process as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.  While we agree that it was error to admit that portion of the recording, we conclude that it was harmless beyond a reasonable doubt and reject the defendant's claim that the credit card convictions should be reversed.

a.  Basic principles.  "The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt."  Commonwealth v. DePace, 433 Mass. 379, 383 (2001), quoting from Commonwealth v. Person, 400 Mass. 136, 141 (1987).  Indeed, Massachusetts cases establish that, at least under the State Constitution, even prearrest,

non-Mirandized invocations of the rights to silence or counsel should not be used to argue consciousness of guilt before the jury and should not even be introduced as evidence at trial because of the risk that the jury will draw that adverse inference.  See Person, 400 Mass. at 141 (stating that it was improper for prosecutor to seek "to have the jury draw an inference of guilt from the defendant's decision to consult an attorney promptly after the shooting" and prearrest); Commonwealth v. Isabelle, 444 Mass. 416, 419 (2005) (testimony regarding defendant's prearrest, post-Miranda request for attorney in course of police questioning at hospital where her minor child was treated for injuries for which she was later charged "violated her State and Federal constitutional rights"); Commonwealth v. Nolin, 448 Mass. 207, 222 (2007) ("[T]he due process protection embodied in the prohibition against arguing guilt from a defendant's decision to consult a lawyer extends beyond the police interrogation context").

While there are multiple contexts in which a defendant may exercise her right to counsel (prearrest or postarrest, pre-Miranda or post-Miranda, in comments to the police or others), the general principle is that "requests to confer with counsel are not a proper subject for comment."  Commonwealth v. Johnston, 467 Mass. 674, 689 (2014).  "A defendant's decision to consult an attorney is not probative in the least of guilt or

innocence, and a prosecutor may not imply that only guilty people contact their attorneys." Person, 400 Mass. at 141 (quotation omitted).

"Assertion of the right to remain silent is highly protected under Federal and State constitutional law. See, e.g., Commonwealth v. Mahdi, 388 Mass. 679, 694-698 (1983)." Commonwealth v. Chase, 70 Mass. App. Ct. 826, 830-831 (2007). In the context of a noncustodial, prearrest exercise of the right to silence, our courts have cautioned that where a "defendant, who was clearly suspected of a crime and had good reason to be cautious about what he said to the police, expressly asserted his right to remain silent," "[s]uch an assertion is 'not competent testimony against such defendants.'" Id. at 832 (quotation omitted). See Commonwealth v. Sazama, 339 Mass. 154, 157 (1959) ("A man, being interrogated under circumstances which reveal that he is suspected of crime, even if not under arrest, certainly may properly assert his constitutional right to consult counsel and may refuse, on the advice of counsel or otherwise, to make statements. See art. 12 of the Declaration of Rights of the Constitution of Massachusetts").

The risk that a jury will draw an improper adverse inference from evidence of a defendant's desire to seek counsel or stay silent is sufficiently great that even evidence

concerning a defendant's failure to meet with law enforcement officers when requested should not be put before the jury. "[E]vidence of a defendant's refusal to comply with a police request may not be admitted because in so refusing a defendant furnishes evidence against himself, and admission of that evidence would violate art. 12." Commonwealth v. Conkey, 430 Mass. 139, 141 (1999) (evidence of defendant's initial assent and subsequent failure to appear for fingerprinting should not have been admitted).

In light of the clear guidance in the case law and implications for the defendant's rights to counsel, silence, and refusal to cooperate with the police, we conclude that the judge should have insisted that the Commonwealth redact the voicemail recording before it was played for the jury and submitted as evidence for their use in deliberations. See Johnston, 467 Mass. at 689 ("All references to counsel . . . should have been the subject of a motion to redact"). The failure to remove portions of the recording addressing the defendant's failure to meet with police, her desire to have counsel, and her desire to assert her right not to say anything to the police was error.

b. Harmlessness beyond a reasonable doubt. Where the defendant preserved her objection to the erroneous admission of material that burdened her rights to counsel and silence, we determine whether the error was harmless beyond a reasonable

doubt by considering the factors initially set out in Mahdi, 388 Mass. at 696-697:  "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted).  See Johnston, 467 Mass. at 690 & n.5; Commonwealth v. Letkowski, 469 Mass. 603, 617 n.22, 619 (2014).[19]

"We proceed to analyze this case under the Mahdi factors, keeping in mind our standard that in addressing an error of this nature 'reversal is the norm, not the exception.'"  Chase, 70 Mass. App. Ct. at 834, quoting from DePace, 433 Mass. at 385.

---

[19] This is the most exacting standard of review to which the defendant's claim would be entitled consistent with our case law, discussed supra, that the error here violated the defendant's constitutional rights, at least under the State Constitution.  That standard has not been applied in all cases where prearrest, pre-Miranda references to counsel are involved. See, e.g., Commonwealth v. Stuckich, 450 Mass. 449, 452-453 (2008).  In Stuckich, 450 Mass. at 453, the court applied the prejudicial error standard from Commonwealth v. Flebotte, 417 Mass. 348 (1994), to the defendant's challenge of an erroneous jury instruction on consciousness of guilt where evidence had been presented both (i) that the defendant responded to the news from a detective that complaints had issued against him by saying that either the defendant or his lawyer would follow up with the detective and (ii) that the detective never heard back from the defendant.  While determining that the underlying evidence did not qualify as consciousness of guilt evidence, the court did not address whether the evidence should not have been admitted in the first place or whether it (or comments by the prosecutor referencing that evidence in closing) constituted constitutional error.  Stuckich, 450 Mass. at 452-454, 460.

Nevertheless, reversal is not automatic.  The circumstances of any given case will determine the outcome of the harmlessness analysis.  See, e.g., Commonwealth v. Peixoto, 430 Mass. 654, 661 (2000) (concluding that error in introduction of evidence of defendant's reluctance to speak with police without counsel was harmless where strength of Commonwealth's case was substantial, "truly objectionable part of the exchange came from" defendant's own testimony, defendant eventually gave statement to police, prosecutor did not dwell on challenged evidence, and judge gave "explicit and thorough" curative instruction).

    i.  The relationship between the evidence and the premise of the defense.  The defense was that Rennie was the culprit. The defendant suggested that Rennie used her name, e-mail address, and shipping address to have a plausible cover when he was ordering women's merchandise and that any benefits the defendant received (like rental payments) were just so Rennie could continue to use her address to keep his scheme going.  The defense also pointed to the circumstantial nature of the Commonwealth's case -- that there was no eyewitness who could identify the defendant as having used the credit cards. Evidence of consciousness of guilt from the defendant's shift in stories and exculpation of Rennie was therefore important to the Commonwealth's trial strategy to refute these arguments and to impeach the defense.  But the defendant's expression of her

desire to have counsel and to remain silent, as well as her failure to cooperate with the investigation, were also susceptible to consciousness of guilt interpretation and so could have impermissibly undermined the premise of the defense.

As in Chase, 70 Mass. App. Ct. at 834, however, the Commonwealth's proof of consciousness of guilt did not rely heavily on the invocations of counsel and silence in the voicemail. The Commonwealth relied on the nonobjectionable portions of the voicemail message for that proof, specifically the inconsistency between the defendant's implication of Rennie to Roers and an unidentified third-party culprit in the voicemail message, and "her tone of voice, her evasiveness in that voicemail." Yet, it cannot be totally discounted that the evasiveness could have been interpreted as a reference to the defendant's failure to meet with Levine as much as her inculpation of an anonymous, new, third-party culprit who she claimed had been "wrecking" her life for years.

Still, this is not a case where the prosecution explicitly argued that the defendant's desire to consult a lawyer (or remain silent or decline to meet with police) was consciousness of guilt. Compare Person, 400 Mass. at 142 ("The assistant district attorney erred in arguing that the decision to consult an attorney rather than a friend was evidence of consciousness of guilt"). This factor (the relationship between the evidence

and the defense) weighs in favor of the defendant, but not heavily so.

ii. <u>Who introduced the issue at trial</u>. As noted, the Commonwealth sought to introduce the voicemail recording and it was admitted over the defendant's objection. Thus, this factor supports the defendant.[20]

iii. <u>The weight and quantum of evidence of guilt</u>. As in <u>Chase</u>, 70 Mass. App. Ct. at 835, "[t]he circumstantial evidence of guilt here was very strong." As discussed more fully below, in order to sustain a conviction of credit card fraud, the Commonwealth must prove that, with the intent to defraud, the defendant represented herself as the person named on a credit card without the cardholder's consent and thereby obtained money, goods, or services. See G. L. c. 266, § 37C(<u>e</u>).

The evidence of the defendant's knowing participation in the credit card fraud, alone or jointly with Rennie, is nearly

---

[20] On the other hand, we note that after the introduction of the voicemail recording, the defendant's cross-examination of Detective Levine elicited context for the investigation and her interactions with him. Thus, Levine testified that he had initially thought that the defendant was basically a pawn and remailer in a larger international scheme (and that remailers often do not get paid for their labor as promised and are out of pocket on shipping expenses). Levine had told the defendant that she would likely not be charged if she cooperated with his investigation, but that she would be charged if she failed to do so. He also told the defendant that he could not force her to come in for an interview, and he testified that she was "certainly free to exercise whatever . . . will she wants to and come in or not come in."

overwhelming.  The Commonwealth introduced ample proof that the defendant either represented herself as each of the victims, or assisted Rennie in doing so, in the course of numerous transactions using the victims' respective credit cards.  The purchases on the victims' credit cards directly benefited the defendant and were made under circumstances that strongly indicated her knowledge and involvement, such as the payment of rent on her apartment, payment of her EZ Pass fees, and the purchase of clothing and accessories that the defendant wanted (like the North Face jacket) and retained (like the Coach purse in which she was already storing personal items when Roers collected it as evidence).  Levine traced at least one of the orders to a Comcast "IP address" in Manchester, and the jury heard evidence that the defendant used Comcast at her Manchester apartment.

More damningly, all of the online orders used the "Brenisha@yahoo.com" e-mail address.  The Commonwealth introduced extensive evidence that this was the e-mail address used by the defendant for personal and professional communication, and that she was the only one who used it.  This evidence included e-mail messages in which she sent her resume to apply for jobs and sent photographs of herself to Rennie and another individual.  In addition, the password used in connection with the order of the Ugg shoes through Deckers.com

was "Corvell83," a combination of the defendant's middle name and the year of her birth. The defendant used this same password when creating other accounts, such as job recruiting Web sites, a Wal-Mart money card, and an account on the social media Web site Twitter, often in conjunction with the "Brenisha@yahoo.com" e-mail address.

Some of the e-mail messages introduced further cemented the connection between the defendant and the fraudulent use of the victims' credit cards. For example, when the defendant attempted to purchase the three pairs of Ugg shoes through Deckers.com, the purchase was rejected on suspicion of fraud. In addition to the call that alerted Raad to the suspicious activity on March 23, 2011, at 8:32 A.M., the manufacturer of Ugg shoes sent an e-mail message addressed to Raad requesting that she contact the manufacturer's order processing department to provide more information for her protection. However, because the defendant's e-mail address had been entered in the purchase interface, this message intended for Raad was routed to the defendant's Yahoo account. An e-mail message was then sent from the defendant's Yahoo account at 5:30 P.M. that same day asking, "What type of info do you need?" The Commonwealth also introduced a March 10, 2011, e-mail message from the defendant's Yahoo account sent in response to an inquiry from a Web site called Bizrate seeking confirmation of receipt of the North Face

jacket ordered from Backcountry.com in which the defendant replied:  "Love my fleece, I will be buying the thicker fleece."

The jury could permissibly infer that the defendant input the victims' names, contact information, and credit card numbers into various online order forms or otherwise conveyed that same information to vendors and that in so doing, and in responding to customer service inquiries, the defendant was fraudulently representing herself to be the victim named on the card she was using in order to obtain goods and services.  The circumstantial nature of the evidence does not undermine its strength.  Cf. Chase, 70 Mass. App. Ct. at 835 ("Although the evidence is purely circumstantial in the instant case, it singles out the defendant").  Despite the defendant's insistence to the contrary, much of the evidence here did in fact single her out. While Rennie is not excluded, the evidence clearly indicates the defendant's knowing participation, such as the payments for her rent and EZ Pass.

Moreover, because the Commonwealth requested and received an instruction pursuant to Commonwealth v. Zanetti, 454 Mass. 449 (2009), the defendant's theory concerning Rennie's involvement would not diminish the quantum of evidence of the defendant's guilt in light of the strong evidence that she "knowingly participated in the commission of the crime charged, with the intent required to commit the crime."  Id. at 468.  The

Commonwealth not surprisingly had already teed up Zanetti arguments in its closing, pointing out that it would be hard for someone who is behind on her bills to claim she had no idea payments on her behalf were made by someone else and that "regardless of who is more or less involved, the fact is just because she wasn't in on it alone doesn't mean that she wasn't in on it."

The evidence that the defendant was aware of any scheme in which Rennie was involved came from the defendant's own comments to Roers. That she joined that scheme for her own benefit is clearly inferable from her response to the e-mail message sent by the manufacturer of the Ugg shoes to Raad in which the defendant sought to resuscitate a fraudulent order charged to Raad's card that had been placed on hold, her e-mail message to Bizrate that she loved the fleece jacket ordered on Luoto's card using her e-mail address, her retention and use of the Coach purse ordered on Raad's card using her e-mail address, and the use of the credit cards to pay for her housing and transportation expenses.

Where the evidence is "truly overwhelming," that factor alone has been found sufficient to render harmless an error of this kind. DePace, 433 Mass. at 386. But even if we take the view that the evidence was not quite so powerful, this factor still weighs heavily in favor of the Commonwealth.

iv.  Frequency of the reference.  Aside from playing the recording (which the jury also had in deliberations), the Commonwealth did not explicitly reference the defendant's comments about desiring a lawyer or asserting her right to stay silent or breaking plans to meet with the police.  Indeed, the defendant concedes that "after admitting the tape, the Commonwealth did not mention [the defendant's] consultation with a lawyer."  Compare id. at 385 (applying Mahdi factors on review for substantial likelihood of miscarriage of justice and reversing where erroneous introduction of defendant's request to speak to attorney was "aggravated" by prosecutor's "special treatment" of evidence, introducing it "not once, but twice" and enlarging defendant's written invocation of counsel on monitor "to maximize the impact on the jury").  As we noted favorably in Chase, 70 Mass. App. Ct. at 835, here "[t]he prosecutor did not . . . reference either statement in opening or closing or in [her] own questioning.  Nor was the point otherwise dwelt upon or emphasized."

In its closing, presenting a litany of the evidence before the jury, the Commonwealth asked the jury to consider "all of the evidence . . . from the online orders[,] . . . the way the defendant benefited from all of those purchases, her motive to do it, the story that she told Detective Roers and how it conflicts with the voicemail that she left later on for

Detective Levine, her tone of voice, her evasiveness in that voicemail to Detective Levine, the fact that she had that Coach purse with her, with all of her personal items, it adds up that the defendant used [the victims'] credit cards and she used their identifying information to obtain or to attempt to obtain, the things that she wanted and that she couldn't have otherwise. And for that reason, I would ask you to find her guilty of all the charges." While the defendant suggests on appeal that the reference to "evasiveness in the voicemail" was an invitation to the jury to consider that her desire to have an attorney present was evidence of consciousness of guilt, we discern "no indication that the prosecutor intended or encouraged the jury to draw that conclusion." Nolin, 448 Mass. at 222 (where Commonwealth introduced recording of telephone conversation in which defendant, already detained on suspicion of murder, asked his friend to send lawyer immediately upon hearing that victim's body had at last been located, and although recording was introduced to show "that the defendant's reaction to news of discovery of the body was inconsistent with innocence," court found no substantial likelihood of miscarriage of justice where "the prosecutor made no mention of or argument premised on [defendant's] request that [his friend] send his attorney). In short, the limited nature of the statements in the voicemail message and the Commonwealth's studious avoidance of any

explicit reference to the defendant's desire for counsel or silence favor the Commonwealth. Indeed, the only party to explicitly raise the defendant's failure to meet with Levine was the defendant herself.[21]

    v. <u>Availability or effect of curative instructions</u>. Prior to playing the voicemail recording, the judge gave the following limiting instruction: "in a moment you're going to hear the content of a telephone call. And you may hear the defendant refer to the issue of wanting to talk to a lawyer. That fact is not anything that you should hold against the defendant, nor should you draw any adverse inference. It's just part of what she said, but the fact that she may have wanted to speak to a lawyer is no evidence of guilt." The judge repeated a similar limiting instruction in the final charge. That the "palliative benefits of a curative instruction," <u>DePace</u>, 433 Mass. at 385, were present here is another factor in favor of the

---

[21] In closing argument, defense counsel said: "You have this DVD, this phone call left on the voicemail of Detective Levine at the Boxborough Police Department. Now, what does she say? She goes on about family issues, her mother and so on. So, from the Commonwealths perspective -- where's the meat potatoes in this? It's when she says, 'Vincent had nothing to do with it.'" Defense counsel went on to explain her implication of an unidentified third party and her failure to meet with Detective Levine as the actions of an "unsophisticated," "naive" woman who is "guilty of poor choice in boyfriends."

Commonwealth.  Prompt curative instructions can suffice to offset this kind of error.  See Peixoto, 430 Mass. at 661 & n.7.

The defendant contends that the instruction further drew the jury's attention to the offending portion of the voicemail message.  However, although the defendant objected to the introduction of the unredacted voicemail message, she did not object to the judge's proposal to give a limiting instruction or to the instruction itself.  Moreover, "[j]urors are presumed to follow a judge's clear instructions and disregard [inadmissible evidence]."  Commonwealth v. Auclair, 444 Mass. 348, 358 (2005).

While the instructions did not explicitly prohibit the jury from drawing adverse inferences from the related invocations of silence or the defendant's failure to meet with police, the defendant did not actually stay silent or refuse to interact with the police.  After the challenged portion of the message, the defendant goes on to make a substantive, self-serving statement to Levine, saying that Rennie is not responsible and that, while she cannot prove it, the person responsible is a third party who has "been [wrecking] [her] life for the past few years."  Despite its ultimately incriminating effect, her statement was obviously intended to further exculpate herself as well.  When a defendant follows a request for counsel or silence with a statement to the police, it mitigates the impact of any impermissible inference because the jury is not given the

48

impression that the defendant was hiding relevant information or left to speculate as to why the defendant asked to speak with her attorney.  Isabelle, 444 Mass. at 421.  See Peixoto, 430 Mass. at 661 ("The defendant's ultimate decision to give a statement to the police also mitigates any impermissible inference the jury may have drawn from his initial hesitation to speak with them").

In sum, on review of the evidence in the entire case, we conclude that the Mahdi "scoreboard," 388 Mass. at 697, indicates that the erroneously admitted portions of the voicemail message are harmless beyond a reasonable doubt. "There was very strong circumstantial evidence of the defendant's guilt and significant evidence of consciousness of guilt on the part of the defendant that did not involve" her assertion of constitutional rights.  Chase, 70 Mass. App. Ct. at 836.  The challenged statements were confined to one piece of evidence "and were not echoed by the prosecutor in [her] questions or opening or closing.  We therefore consider this one of the exceptional cases where objected-to and erroneous testimony regarding the defendant's assertion of [constitutional rights to counsel and silence] does not require reversal." Ibid.

Conclusion.  The judgments on the counts alleging identity fraud and receiving stolen property are vacated, the verdicts

are set aside, and the indictments thereon are dismissed.  The judgments on the counts alleging credit card fraud and attempted credit card fraud are affirmed.

<u>So ordered</u>.